**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

---

In Re: Administrative Subpoena No. 25-1431-019

MBD No. _____

**FILED UNDER SEAL**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>BOSTON CHILDREN'S HOSPITAL'S MOTION TO QUASH</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Boston Children's Hospital Provides Lawful Gender-Affirming Care...................3

    B.    Gender-Affirming Care Is Guaranteed Under Massachusetts Law .........................5

    C.    The Coordinated Federal Campaign to Eliminate Gender-Affirming Care............6

    D.    The Subpoena Issued to BCH .............................................................................10

LEGAL STANDARD ...........................................................................................................12

ARGUMENT ........................................................................................................................12

I.      The Subpoena Lacks a Congressionally Authorized Purpose............................................12

II.    The Subpoena Does Not Seek Documents Relevant to an Authorized Purpose................18

III.   The Subpoena Requests Are Overbroad, Vague, and Unduly Burdensome Such
        That the Subpena Is Not Adequately Described and Is Not Reasonable and Would,
        at the Very Least, Need to Be Substantially Narrowed.....................................................18

CONCLUSION......................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)...........................................................................................2, 16

*Doe v. United States*,
    253 F.3d 256 (6th Cir. 2001) ............................................................................. 12, 19

*FTC v. Bisaro*,
    2010 WL 3260042 (D.D.C. July 13, 2010)....................................................................17

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)..........................................................................................5, 13

*Gonzales v. Oregon*,
    546 U.S. 243 (2006).......................................................................................5, 6, 13

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
    471 U.S. 707 (1985).......................................................................................5, 13

*In re Neurontin Mktg. & Sales Pracs. & Prods. Litig.*,
    2010 WL 3169485 (D. Mass. Aug. 10, 2010) ...............................................................16

*In re Sealed Case (Administrative Subpoena)*,
    42 F.3d 1412 (D.C. Cir. 1994) ...........................................................................2, 15

*In re Subpoena Duces Tecum*,
    228 F.3d 341 (4th Cir. 2000) ...........................................................................19

*Okla. Press Publ'g Co. v. Walling*,
    327 U.S. 186 (1946).........................................................................................12, 20

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
    648 F.2d 118 (3d Cir. 1981) (en banc)...............................................................17

*U.S. Dep't of Just. v. Ricco Jonas*,
    24 F.4th 718 (1st Cir. 2022).......................................................................2, 12, 18

*U.S. ex rel. Carpenter v. Abbott Labs, Inc.*,
    723 F. Supp. 2d 395 (D. Mass. 2010) ...............................................................16

*United States v. Church of Scientology of Cal.*,
    520 F.2d 818 (9th Cir. 1975) ...........................................................................17

*United States v. Clarke*,
    573 U.S. 248 (2014)..........................................................................................17

ii

*United States v. Fensterwald,*
    553 F.2d 231 (D.C. Cir. 1977) .......................................................................17

*United States v. Joint Active Systems, Inc.*, 2020 WL 9747630 (D. Mass. May 20,
    2020), *report & recommendation adopted*, 2020 WL 9748373 (D. Mass.
    Oct. 7, 2020) ...............................................................................................18

*United States v. Markwood,*
    48 F.3d 969 (6th Cir. 1995) .....................................................................14, 15

*United States v. Powell,*
    379 U.S. 48 (1964) ...................................................................................12, 14

*United States v. R. Enterprises,*
    498 U.S. 292 (1991) .......................................................................................15

*United States v. Salter,*
    432 F.2d 697 (1st Cir. 1970) ..........................................................................17

*United States v. Skrmetti,*
    145 S. Ct. 1816 (2025) ................................................................................5, 13

*United States v. Theodore,*
    479 F.2d 749 (4th Cir. 1973) ..........................................................................19

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .....................................................................................6, 13

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 24 ...........................................................................................................12

18 U.S.C. § 3486 ...............................................................................................*passim*

18 U.S.C. § 3486(a)(1)(A) .........................................................................................12

18 U.S.C. § 3486(a)(5) ................................................................................................3

21 U.S.C. § 396 .........................................................................................................16

Mass. Gen. Laws ch. 12, § 11I½(b) ...............................................................6, 13, 15

## OTHER AUTHORITIES

*About Us*, Boston Children's Hospital, https://tinyurl.com/3vjxrj6t (last visited
    July 8, 2025)...................................................................................................4

*Center For Transyouth Health and Development*, Children's Hospital Los
    Angeles, https://tinyurl.com/y9k2bkvb (last visited July 8, 2025) ..................10

Chrissy Suttles, *Crowds Protest UPMC Ending Gender-Affirming Youth Care*, Axios (June 29, 2025), https://tinyurl.com/mt233enh ......................................10

Christine Allen et al., *Off-Label Medication use in Children, More Common than We Think: A Systematic Review of the Literature*, J Okla State Med Assoc. (Oct. 2018), https://tinyurl.com/5x7n5dfm ..........................................................16

*Clarification on Evidence-Based Gender-Affirming Care H-185.927*, American Medical Association (2024), https://tinyurl.com/38mcbdjk  (last visited July 8, 2025) ..........................................................................................................4

David Zalubowski, *Some Hospitals Pause Gender-Affirming Care to Evaluate Trump's Executive Order*, NBC News (Jan. 31, 2025), https://tinyurl.com/f4h3ksve ............................................................................10

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, The White House (January 20, 2025), https://tinyurl.com/227z34e3 ..............................................................................6

Eli Coleman et al., *Standards of Care for the Health of Transfer and Gender Diverse People,* Version 8, International Journal of Transgender Health, World Professional Association for Transgender Health (WPATH) (Sept. 15, 2022), https://tinyurl.com/459r3jth ..................................................................5

*Ending Radical Indoctrination in K-12 Schooling*, The White House (Jan. 29, 2025), https://tinyurl.com/mhk6vx84 ......................................................................7

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://tinyurl.com/dndywmzr (last visited July 8, 2025) ..................................16

*Gender Multispecialty Service (GeMS)*, Boston Children's Hospital https://tinyurl.com/2ke3rexb  (last visted July 8, 2025) ................................4, 15

Joanne LaFleur, *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria*, University of Utah College of Pharmacy (August 6, 2024), https://tinyurl.com/ms3ky8sc ....................................................................4

*Initial Rescissions of Harmful Executive Orders and Actions*, The White House (Jan. 20, 2025), https://tinyurl.com/4tnrnwmc..................................................7

*Keeping Men Out of Women's Sports*, The White House (Feb. 5, 2025), https://tinyurl.com/bddcasam..................................................................................7

Loren Bonner and Clarissa Chan, *Health Care Teams for Gender-Affirming Care Have a Clear Place for Pharmacists,* American Pharmacists Association, https://shorturl.at/DKxI6 (last visited July 8, 2025) ........................................16

*Memorandum from Assistant Attorney General Brett A. Shumate*, (June 11, 2025),
    https://tinyurl.com/mr3bym4f .................................................................................... *passim*

*Memorandum from Attorney General, Preventing the Mutilation of American*
    *Children, Office of the Attorney General* (April 22, 2025),
    https://tinyurl.com/2b9kaja7 ...............................................................................1, 8, 14

Patrick Boyle, *What Is Gender-Affirming Care? Your Questions Answered*,
    Association of American Medical Colleges (AAMC) (April 12, 2022),
    https://tinyurl.com/5n6nj8ej....................................................................................4

*Prioritizing Military Excellence and Readiness*, The White House (Jan. 27, 2025),
    https://tinyurl.com/yvhbanfx ...................................................................................7

*Protecting Children from Chemical and Surgical Mutilation*, The White House
    (Jan. 28, 2025), https://tinyurl.com/mwadx9cw ......................................................1, 7, 14

Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under*
    *Pressure from Trump*, Los Angeles Times (June 12, 2025),
    https://tinyurl.com/276vhe7y ..............................................................................10

*What is Gender Dysphoria*, American Psychiatric Association,
    https://tinyurl.com/mryzd4p3 (last visited July 8, 2025)....................................................4

## INTRODUCTION

The Children's Hospital Corporation d/b/a Boston Children's Hospital ("BCH") respectfully moves to quash an administrative subpoena duces tecum, issued by the U.S. Department of Justice ("DOJ"), that commands production of information and documents relating to the hospital's provision of gender-affirming care ("GAC"). The subpoena seeks a broad swath of highly sensitive and confidential records related to both patients and providers, including personnel records for nearly all medical employees at BCH, as well as extensive billing and diagnosis coding materials and communications with third parties.

The subpoena is the latest salvo in the current Administration's effort to prevent patients from accessing lawful medical care that the Administration disfavors, even where that care is expressly protected by state law, as it is in Massachusetts. On January 28, 2025, President Trump issued an executive order calling for the end of GAC.[1] The Attorney General soon followed with her vision of how to carry out this order, and on the same date that this subpoena was issued, the leader of DOJ's Civil Division stated that DOJ would use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives."[2] But regulation of the practice of medicine is primarily the responsibility of the States. Massachusetts law guarantees patients access to this care. There is no lawful basis for the executive branch of the federal government to dictate the standard of

---

[1] *See Protecting Children from Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://tinyurl.com/mwadx9cw.

[2] *Memorandum from Attorney General, Preventing the Mutilation of American Children, Office of the Attorney General*, at 3-4 (April 22, 2025) (hereinafter "Preventing the Mutilation of American Children Memo"), https://tinyurl.com/2b9kaja7*; Memorandum from Assistant Attorney General Brett A. Shumate, Civil Division Enforcement Priorities, Office of the Assistant Attorney General*, at 2-3 (June 11, 2025) (hereinafter "Civil Division Memo"), https://tinyurl.com/mr3bym4f.

medical care in this area throughout all fifty States.  And the Administration's effort to use DOJ and law enforcement process to effectuate this policy goal is highly improper.

DOJ's discretion to issue subpoenas, though wide, is not unlimited.  An administrative subpoena must be issued for a congressionally authorized purpose, seek information relevant to that purpose, and adequately describe the information sought.  *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022).  The subpoena here fails at every step of this analysis.

*First*, seeking to block lawful medical treatment, by opening an unfounded and politically motivated law enforcement investigation, is not a congressionally authorized purpose.  Nor is issuing a subpoena in search of "wrongdoing, as yet unknown."  *In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994).  Yet that is what the government is seeking to do.  The subpoena's purpose is clear:  it was issued to effectuate the President's executive orders and DOJ's memoranda that explicitly seek to bring an end to a type of medical treatment that is both lawful and recognized as a constitutional right under Massachusetts law, yet that this Administration disfavors.  This has never been a legitimate purpose for a law enforcement investigation pursuant to 18 U.S.C. § 3486, the statute under which DOJ purports to derive authority.  Any grounds for the subpoena asserted by DOJ are wholly pretextual.  There have been no allegations regarding billing, or any other, fraud at BCH.  Moreover, precedent makes clear that limitations on off-label promotion of pharmaceutical products imposed by the Federal Food, Drug, and Cosmetic Act ("FDCA") do not restrict doctors' ability to prescribe medications for their patients.  *See*, *e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).  The practice of medicine is generally a question of state, not federal law.  The Trump Administration is not authorized to set national medical policy, much less through the law enforcement process, as it has attempted to do.

2

*Second*, the information sought by the subpoena—including highly sensitive patient and provider information—is not relevant to any congressionally authorized purpose. Even if the government were pursuing a congressionally authorized purpose (which it is not), the requests here seek information far removed from any such purpose. There is no conceivable reason why DOJ would need personnel files for medical providers or hospital board members (Request No. 1) or the names, dates of birth, social security numbers, addresses, and parent/guardian information for patients who received GAC (Request No. 11). Instead, these requests appear designed to intimidate doctors and patients and to deter them from providing or seeking lawful medical care.

*Third*, the subpoena is overbroad, vague, and unduly burdensome and therefore the information sought is not "adequately described." The subpoena seeks "any" and "all" documents in a wide range of areas for over half a decade. It also seek documents regulated by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), including patient medical records and other confidential materials protected from disclosure. The intrusions on patient and provider privacy, and the burdens on BCH, are significant, improper, and wholly unjustified.

This subpoena constitutes an abuse of the narrowly circumscribed authority provided to the government under 18 U.S.C. § 3486 to investigate federal health care offenses. BCH respectfully moves, pursuant to 18 U.S.C. § 3486(a)(5), to quash the administrative subpoena.

## BACKGROUND

### A.    Boston Children's Hospital Provides Lawful Gender-Affirming Care

As one of the leading pediatric hospitals in the nation, BCH is dedicated to improving and advancing the health and well-being of children through its work in clinical care, biomedical research, medical education, and community engagement. BCH is the largest pediatric research enterprise in the world. With more than 40 clinical departments and 258 specialized clinical programs, BCH provides a complete range of health care services for children of all ages and

3

adults.[3]  As relevant here, BCH is also home to the first pediatric and adolescent transgender health program in the United States.  Since 2007, BCH's Gender Multispecialty Service ("GeMS") has offered medical and mental health care for gender-diverse youth, adolescents, and young adults and support for their families, including physical and psychological assessments, ongoing medical care, therapy and support groups, and investment in research and training.[4]

Major medical organizations across specialties recognize gender dysphoria—which occurs when there is a conflict between the sex a person is assigned at birth and the gender with which they identify—as a medical condition that can cause significant distress but can be addressed by GAC.[5]  A recent University of Utah report noted that "the consensus of the evidence supports that [GAC] treatments are effective in terms of mental health, psychosocial outcomes, and the induction of body changes consistent with the affirmed gender in pediatric [gender dysphoria] patients."[6]

GAC is a vital lifeline for many gender-diverse individuals, who may otherwise experience severe distress, anxiety, depression, and suicidal ideation.[7]  Doctors have described GAC as "a

---

[3] *About Us*, Boston Children's Hospital, https://tinyurl.com/3vjxrj6t (last visited July 8, 2025).

[4] *Gender Multispecialty Service (GeMS)*, Boston Children's Hospital, https://tinyurl.com/2ke3rexb (last visited July 8, 2025).

[5] *See e.g.*, *Clarification on Evidence-Based Gender-Affirming Care H-185.927*, American Medical Association (2024), https://tinyurl.com/38mcbdjk  (last visited July 8, 2025) ("medical and surgical treatments for gender dysphoria and gender incongruence, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice."); *What is Gender Dysphoria*, American Psychiatric Association, https://shorturl.at/nVNCA (last visited July 8, 2025) (outlining treatment options); *see also* Diagnostic & Statistical Manual of Mental Disorders, (American Psychiatric Association, 6th ed.).

[6] Joanne LaFleur, *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria*, University of Utah College of Pharmacy (August 6, 2024), at 90, https://tinyurl.com/ms3ky8sc.

[7] Patrick Boyle, *What Is Gender-Affirming Care? Your Questions Answered*, Association of American Medical Colleges (AAMC) (April 12, 2022), https://tinyurl.com/5n6nj8ej.

medical necessity, like providing insulin to a person with diabetes."[8]  There is no "one-size-fits-all" approach to GAC—it is adapted to the needs of each patient.[9]  GAC can include puberty suppression, hormone therapy, and in very rare cases gender-affirming surgery,[10] although BCH does not perform GAC surgeries for minors.

BCH offers GAC based on the needs of individual patients and their families, taking into account the applicable clinical, ethical, and legal considerations based on the specific treatment at issue.  As with all care at BCH, GAC requires parent or guardian consent (alongside the minor's assent).  BCH adheres to Massachusetts law and American Academy of Pediatrics guidelines when advising patients and their families regarding GAC.

**B.**    **Gender-Affirming Care Is Guaranteed Under Massachusetts Law**

"[R]egulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.,* 471 U.S. 707, 719 (1985). Congress has only rarely "set uniform national standards in these areas," *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006).  Just last month, in deciding a case about Tennessee's right to regulate the provision of transgender care, the Supreme Court squarely reaffirmed this longstanding principle in the specific context of GAC, with Chief Justice Roberts stating that "[w]e afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'"  *United States v. Skrmetti*, 145 S. Ct. 1816, 1836 (2025) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)).  When the federal government seeks to disrupt that historical balance, courts look for a clear indication that Congress intended to do so.  *West Virginia v. EPA*, 597 U.S. 697, 722-24 (2022)

---

[8] *Id.* (quoting Dr. Katherine Imborek, Co-director of University of Iowa Health Care's LGBTQ Clinic).
[9] Eli Coleman et al., *Standards of Care for the Health of Transfer and Gender Diverse People,* Version 8, International Journal of Transgender Health, World Professional Association for Transgender Health (WPATH) (2022), at S7, https://tinyurl.com/459r3jth.
[10] *Id.*

(citing *Oregon* as example of a "major questions case").   There is no such congressional statement here.

As is their right in our constitutional system, the people of Massachusetts have taken an unequivocal stance in support of GAC, enshrining it as a protected right under state law.  According to Mass. Gen. Laws ch. 12, § 11I½(b), "[a]ccess to … gender-affirming health care services is a right secured by the constitution and laws of the commonwealth.  Interference with this right, whether or not under the color of law, is against the public policy of the commonwealth."  *Id.*. BCH is located in Boston and provides services in accordance with the standards of care under Massachusetts law.  Interference with such care would not only contravene state law but also undermine BCH's duty to provide comprehensive, patient-centered care in accordance with the rights guaranteed to all Massachusetts residents.

### C.    The Coordinated Federal Campaign to Eliminate Gender-Affirming Care

The current Administration has demonstrated a pattern of hostility toward the transgender community by seeking to delegitimize the concept of gender identity and dismantle access to GAC. Disapproval of the transgender community and GAC was a central pillar of President Trump's 2024 presidential campaign, including promising a federal ban on GAC for minors and threatening to use federal investigatory authority to halt GAC.

Those campaign promises were a preview for this Administration's subsequent intense focus on transgender individuals.  On his first day in office, President Trump issued Executive Order 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[11]  The order declared that gender identity is a "false" idea, that U.S. policy recognized "two sexes, male and female," and that "[t]hese sexes are not

---

[11] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, The White House (January 20, 2025), https://tinyurl.com/227z34e3.

6

changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. The order stated that "[e]fforts to eradicate the biological reality of sex" are "wrong" and have "a corrosive impact … on the validity of the entire American system." *Id.* § 1.

President Trump subsequently issued executive orders rescinding various protections for transgender people, prohibiting them from serving in the military, eliminating federal funding from schools that support "gender ideology," and banning transgender women and girls from competing in sports aligned with their gender identity.[12] The language in these orders attacked transgender persons as dishonest and unreliable—for example, the executive order banning transgender individuals from serving in the military stated that transgender individuals were not capable of the "honorable, truthful, and disciplined lifestyle" required of service members.[13]

Without seeking any legislation from Congress to carry out the Administration's attempt to federalize the regulation of medical care in this area, the Administration also undertook a concerted effort to change how doctors were treating patients with gender dysphoria. Of central importance here, on January 28, 2025, President Trump issued Executive Order 14187, aimed at restricting access to medical care for transgender youth.[14] Titled "Protecting Children from Chemical and Surgical Mutilation," the executive order made clear that the Administration's goal was to "end" the provision of GAC. The order villainized medical professionals for allegedly "maiming and sterilizing a growing number of impressionable children under the radical and false claim that

---

[12] *See Initial Rescissions of Harmful Executive Orders and Actions*, The White House (Jan. 20, 2025), https://tinyurl.com/4tnrnwmc; *Prioritizing Military Excellence and Readiness*, The White House (Jan. 27, 2025), https://tinyurl.com/yvhbanfx; *Ending Radical Indoctrination in K-12 Schooling*, The White House (Jan. 29, 2025), https://tinyurl.com/mhk6vx84; *Keeping Men Out of Women's Sports*, The White House (Feb. 5, 2025), https://tinyurl.com/bddcasam.

[13] *Prioritizing Military Excellence and Readiness*, The White House (Jan. 27, 2025), https://tinyurl.com/yvhbanfx.

[14] *See Protecting Children from Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://tinyurl.com/mwadx9cw.

adults can change a child's sex through a series of irreversible medical interventions." *Id.* § 1. It then proclaimed that "[t]his dangerous trend will be a stain on our Nation's history, and it must end." *Id.* The order stated that the U.S. "will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another," and "will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." *Id.* The order defined the phrase "chemical and surgical mutilation" as "the use of puberty blockers," "the use of sex hormones," and "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex." *Id.* § 2. It also noted that "chemical and surgical mutilation" is "sometimes … referred to as 'gender-affirming care.'" *Id.*

These executive orders were marching orders for federal agencies. On April 22, 2025, Attorney General Bondi issued a memorandum, titled "Preventing the Mutilation of American Children," directing the Civil Division of DOJ to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[15] Attorney General Bondi stated (at 1) that gender ideology, "pushed by far-left politicians, celebrities, politically captured academics, and legacy media, has infected an entire generation of children, who have in turn pushed transgenderism on their peers through social media and other means." She also directed (at 4) the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." Examples of such false claims included "physicians prescribing

---

[15] Preventing the Mutilation of American Children Memo, at 4.

puberty blockers to a child for an illegitimate reason (e.g., gender dysphoria) but reporting a legitimate purpose (i.e., early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure." *Id.* at 4. But the real purpose of DOJ's planned enforcement in this area is clear—eliminating GAC. The memo (at 6) concludes:

> Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will bring these practices to an end.

On June 11, 2025, the same day this subpoena was issued, the head of the Civil Division issued a memorandum to all Division employees ("Civil Division Memo") regarding enforcement priorities.[16] This memorandum, which explicitly referenced President Trump's executive orders and Attorney General Bondi's April 2025 memorandum, stated (at 2) that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives." The memorandum (at 2) quoted Attorney General Bondi's inflammatory language stating that the Department would "hold accountable those who mutilate [children] under the guise of care" and pursue investigations of "radical gender experimentation." It explained (at 2-3) that the Division's efforts "will include, but will not be limited to, possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs." The memo also stated (at 3) that the Division "will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes,

---

[16] Civil Division Memo, at 2-3

for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes."

This motion does not ask the Court to decide the legality of executive orders or policy pronouncements by the Administration regarding transgender care or to resolve areas of medical and scientific uncertainty. Instead, the heart of this motion is whether Congress has in clear terms granted the Administration the power to block BCH from providing medical care consistent with the laws of the Commonwealth of Massachusetts.

It is clear that the Administration's intimidation campaign has already had a chilling effect on GAC. Hospitals and providers are being forced to weigh whether they can continue to offer life-saving GAC and, if so, at what cost. For instance, under escalating pressure from the Administration, hospitals in Washington, D.C., Richmond, and Denver have already begun scaling back GAC, including halting critical prescriptions for puberty blockers and hormone therapy.[17] The University of Pittsburgh Medical Center decided this year to no longer offer gender-affirming care for individuals under the age of 19.[18] Clinics that serve transgender individuals are even shutting down entirely.[19] The Center for Transyouth Health and Development at the Children's Hospital of Los Angeles is closing this month—after providing care for more than 30 years—citing "no viable path forward."[20]

### D.    The Subpoena Issued to BCH

On June 11, 2025, DOJ served BCH with an administrative subpoena purportedly issued

---

[17] *See* David Zalubowski, *Some Hospitals Pause Gender-Affirming Care to Evaluate Trump's Executive Order*, NBC News (Jan. 31, 2025), https://tinyurl.com/f4h3ksve.

[18] *See* Chrissy Suttles, *Crowds Protest UPMC Ending Gender-Affirming Youth Care*, Axios (June 29, 2025), https://tinyurl.com/mt233enh.

[19] *See* Sonja Sharp, *Children's Hospital Los Angeles Halts Transgender Care Under Pressure from Trump*, Los Angeles Times (June 12, 2025), https://tinyurl.com/276vhe7y.

[20] *See Center for Transyouth Health and Development*, Children's Hospital Los Angeles, https://tinyurl.com/y9k2bkvb (last visited July 8, 2025).

pursuant to 18 U.S.C. § 3486. *See* Ex. 1. The BCH subpoena response deadline is July 9, 2025, and BCH is one of several hospitals that received a DOJ subpoena seeking information about the provision of gender-affirming care. The subpoena contains 15 separate requests for documents that seek practically every document related to BCH's staff and the hospital's GAC, going back five and a half years.

- Request No. 1 seeks personnel files for BCH executives, management employees, and hospital board members; individuals who have authority to prescribe medications or perform medical evaluations (presumably essentially all physicians, residents, interns, nurse practitioners, and nurses); and individuals who are engaged in billing activities. Importantly, this request is in no way limited to the provision of gender-affirming care and presumably sweeps up the nearly 2,000 individuals who perform the functions articulated by the government in this request.

- Requests Nos. 2-6 seek documents and communications—including billing records, insurance claims, internal protocols, and guidance—concerning the use of diagnosis or billing codes in connection with gender-affirming care for minor patients, as well as certain training materials.

- Requests Nos. 7-10 seek documents received from and communications with pharmaceutical manufacturers, compounding pharmacies, sales representatives, marketing departments, or medical science liaisons relating to the treatment of gender dysphoria or the use of puberty blockers or hormones in connection with gender-affirming care for minor patients, as well as certain documents relating to financial arrangements with manufacturers or pharmacies.

- Request No. 11 seeks "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request No. 12 seeks the medical records of children, asking that for each identified patient, BCH provide "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request No. 13 seeks "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."

- Requests Nos. 14-15 seek documents and communications relating to safety and efficacy of puberty blockers or hormone therapy in gender-affirming care for minors and to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

11

## LEGAL STANDARD

A motion to quash a subpoena issued under 18 U.S.C. § 3486 is subject to the standard generally applicable to a motion to quash an administrative subpoena. *See Doe v. United States*, 253 F.3d 256, 268 (6th Cir. 2001). An agency's administrative subpoena is enforceable if "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Ricco Jonas*, 24 F.4th at 726 (citation omitted); *United States v. Powell*, 379 U.S. 48, 57-58 (1964). "Persons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Okla. Press Publ'g Co. v. Walling,* 327 U.S. 186, 217 (1946); *see also Doe*, 253 F.3d at 265 (holding that an administrative subpoena must "satisf[y] the terms of its authorizing statute"). Section 3486 administrative subpoenas differ from federal grand jury subpoenas because they may only be issued in investigations concerning the limited universe of federal criminal offenses identified in the statute. *See* 18 U.S.C. § 3486(a)(1)(A).

## ARGUMENT

### I.    THE SUBPOENA LACKS A CONGRESSIONALLY AUTHORIZED PURPOSE

To be enforceable, an administrative subpoena must be issued for a congressionally authorized purpose. *Ricco Jonas*, 24 F.4th at 726. Here, the subpoena was issued pursuant to 18 U.S.C. § 3486, through which Congress authorized investigations into a "federal health care offense." *See* 18 U.S.C. § 24. The requests included in the subpoena are not aimed at investigating any such offense. Instead, they are aimed at regulating (and chilling) a particular type of medical care, with the goal of eliminating it nationwide, even where access to that care has been explicitly enshrined in state law. Manufacturing a federal criminal law enforcement investigation to obstruct

lawful medical care—based on the Administration's policy views—is improper and exceeds the bounds of congressional authorization.

The Supreme Court has consistently affirmed that the "regulation of health and safety is 'primarily, and historically, a matter of local concern.'" *Hillsborough Cnty.,* 471 U.S. at 719. While Congress may "set uniform national standards in these areas," it has done so sparingly. *See Oregon*, 546 U.S. at 271. Moreover, when the federal government attempts to overturn that historical balance of state authority in this realm, courts require a clear indication that Congress intended such a shift. *See West Virginia*, 597 U.S. at 722-23 (citing *Oregon* as example of "major questions doctrine"). This is because allowing the federal government "to define general standards of medical practice in every locality" would be a "radical shift of authority" away from the States. *Oregon*, 546 U.S. at 275. The Supreme Court recently reiterated the longstanding principle that States are afforded "wide discretion" to enact legislation in areas where there is policy debate, such as the provision of gender-affirming care. *Skrmetti*, 145 S. Ct. at 1836 (quoting *Carhart*, 550 U.S. at 163). It is clear that under controlling Supreme Court precedent, this widely debated issue concerning the practice of medicine is left to the States in our constitutional system of government.

And on this issue, Massachusetts has spoken. The elected representatives of the people of Massachusetts have exercised that discretion by explicitly protecting access to GAC under state law, recognizing it as a constitutional right. *See* Mass. Gen. Laws ch. 12, § 11I½(b). Absent express congressional authority, the federal government cannot "second-guess the lines" Massachusetts has drawn in this state-directed realm. *See Skrmetti*, 145 S. Ct. at 1836. But that is precisely what the Administration is doing. It has proclaimed by fiat that GAC is not medical care but rather "chemical and surgical mutilation," and it seeks to "end" the provision of that care

nationwide.[21]    It has determined that "prescribing puberty blockers" as part of GAC is "illegitimate" medical care and should be investigated.[22]   And it has made the regulation of medicine an "enforcement priority."[23]  It is clear the federal government is attempting to regulate the practice of medicine via a criminal investigation, without express congressional authorization to do so.

Suppressing access to lawful GAC by deterring patients and providers through intimidation and fear of criminal charges also constitutes bad faith.  Courts have long recognized that HIPAA subpoenas may be "resisted if the agency acted in 'bad faith,'" including when subpoenas are used to harass or pressure recipients.  *United States v. Markwood*, 48 F.3d 969, 978 (6th Cir. 1995); *see also Powell,* 379 U.S. at 58 (administrative subpoena not enforceable if "issued for an improper purpose, such as to harass … or to put pressure" on the subject).  Here, the subpoena follows a series of executive orders that explicitly target transgender individuals, including one that seeks to "end" the provision of GAC nationwide, equates GAC with "chemical and surgical mutilation," and accuses providers of "maiming and sterilizing" transgender youth.[24]   Moreover, the Civil Division Memo (at 2) directs federal law enforcement resources toward investigating "doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives."   In lockstep with that directive, DOJ issued this subpoena to BCH seeking, among other things, documents identifying minors receiving GAC (Request No. 11) and the medical basis for providing that care (Request No. 12)  The use of a criminal health care fraud investigative tool to block access to lawful medical care not only lacks a legitimate enforcement purpose—it

---

[21] *Protecting Children from Chemical and Surgical Mutilation,* § 2(c).
[22] Preventing the Mutilation of American Children Memo, at 4.
[23] Civil Division Memo, at 2-3.
[24] *Protecting Children from Chemical and Surgical Mutilation,* § 2(c).

14

exemplifies improper purpose and "bad faith." *Markwood*, 48 F.3d at 978.

Any assertions that the subpoena is based on a proper congressionally authorized purpose would be entirely pretextual. The government has failed to articulate any suspicion of wrongdoing by BCH that would justify the subpoena's intrusion, and it is well-established that issuing a subpoena in search of "wrongdoing, as yet unknown" is not a congressionally authorized purpose. *In re Sealed Case (Administrative Subpoena)*, 42 F.3d at 1418. As the Supreme Court has explained, a subpoena is not a roving license to troll for any evidence of wrongdoing. *United States v. R. Enters.*, 498 U.S. 292, 299 (1991). Indeed, an agency's investigative powers may not be used merely to "cast about for potential wrongdoing." *In re Sealed Case (Administrative Subpoena)*, 42 F.3d at 1418.

To the extent the government purports to investigate possible billing fraud in violation of the False Claims Act or possible violations of the FDCA, these theories are factually and legally deficient. As to fraudulent billing, the Civil Division Memo, which prompted the subpoena here, states (at 3) that DOJ will investigate providers "attempt[ing] to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes." But Massachusetts, where BCH is located, does not have such a ban. In fact, access to GAC is guaranteed under Massachusetts law. *See* Mass. Gen. Laws ch. 12, § 11I½(b). BCH's GeMS program operates transparently, with a public-facing website that provides extensive information about the care BCH offers.[25] There is no incentive for BCH to submit claims with "false diagnosis codes" in order to evade nonexistent state bans, and similarly no basis for any billing fraud theory.

---

[25] *Gender Multispecialty Service (GeMS)*, Boston Children's Hospital https://tinyurl.com/2ke3rexb (last visited July 8, 2025).

There is also no support for a theory that the hospital has somehow violated the FDCA in connection with "off-label use" of medications for GAC.  As is quite common in the pediatric space, many medications prescribed as part of providing gender-affirming care are used off-label.[26] While in some circumstances the government can regulate the off-label *promotion* of FDA-approved medications, Congress has expressly limited the federal government's authority to regulate the practice of medicine, including the off-label *use* of prescription drugs, through the FDCA.  As the Supreme Court has explained, refraining from interfering with doctor's off-label use is "an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine."  *Buckman Co.*, 531 U.S. at 350; *see also In re Neurontin Mktg. & Sales Pracs. & Prods. Litig.*, 2010 WL 3169485, at *4 (D. Mass. Aug. 10, 2010) ("Doctors are permitted to prescribe drugs off-label."); *U.S. ex rel. Carpenter v. Abbott Labs, Inc.*, 723 F. Supp. 2d 395, 397 n.2 (D. Mass. 2010) ("[T]he FDA has never as a general matter prohibited the off-label prescription of drugs.").[27]  The Civil Division Memo recognizes as much (at 3), noting that potential violations of the FDCA would be limited to off-label *promotion* by "pharmaceutical companies that manufacture" GAC medication and "dealers such as online pharmacies."  The Memo is consistent with the Supreme Court's recognition that the FDCA does not regulate the practice of medicine.  *Buckman Co.*, 531 U.S. at 351 (noting that the FDCA "expressly disclaims any intent to directly regulate the practice of medicine."); *see also* 21 U.S.C.

---

[26]  *See* Loren Bonner and Clarissa Chan, *Health Care Teams for Gender-Affirming Care Have a Clear Place for Pharmacists,* American Pharmacists Association, https://shorturl.at/DKxI6 (last visited July 8, 2025); Christine Allen et al., *Off-Label Medication use in Children, More Common than We Think: A Systematic Review of the Literature*, J Okla State Med Assoc. (Oct. 2018), https://tinyurl.com/5x7n5dfm.

[27]  *See also* FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* https://tinyurl.com/dndywmzr ("From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient.").

§ 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").  Thus, any theory DOJ may seek to pursue that BCH physicians are improperly prescribing medications for GAC based on their off-label use cannot provide the basis for an investigation of BCH under the FDCA.  And the scope of the subpoena makes clear that it is not merely seeking information relating to potential off-label promotion by manufacturers or pharmacies.

In sum, the subpoena issued to BCH lacks any legitimate legal basis.  Even if the evidence described above did not establish the government's bad faith as a matter of law, it is more than sufficient to "plausibly rais[e] an inference of bad faith" or "improper motive," which is all that is necessary to require an evidentiary hearing on the issue.  *United States v. Clarke*, 573 U.S. 248, 254-55 (2014).  Courts have made clear that discovery may be permitted to determine whether the government was acting in bad faith in issuing an administrative subpoena or civil investigative demand.  *See SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981) (en banc), *United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977); *FTC v. Bisaro*, 2010 WL 3260042, at *4-6 (D.D.C. July 13, 2010).  Courts have also permitted evidentiary hearings to determine the government's motives.  *See United States v. Salter*, 432 F.2d 697, 700 (1st Cir. 1970); *United States v. Church of Scientology of Cal.*, 520 F.2d 818, 824-25 (9th Cir. 1975); *see also Clarke*, 573 U.S. at 254.  Thus, to the extent more evidence of bad faith is necessary, BCH respectfully requests discovery on this issue, followed by a hearing, and for the subpoena to be stayed pending the outcome.

## II.    THE SUBPOENA DOES NOT SEEK DOCUMENTS RELEVANT TO AN AUTHORIZED PURPOSE

To enforce an administrative subpoena, a court must also determine that the information sought is relevant to the authorized purpose. *Ricco Jonas*, 24 F.4th at 726 (citation omitted). The subpoena here does not seek documents or information related to any authorized purpose.

*First*, even if the government's objective was to uncover billing fraud, certain requests are not relevant to that type of investigation. For instance, Request No. 1 seeks the "[c]omplete personnel files" for the vast majority of employees at the hospital, irrespective of whether they have any connection to billing or the provision of gender-affirming care. There is no conceivable basis for why it would need this extent of personnel files. Patient records that identify them by name (Request No. 11) and detailed information about the medical basis for treatment and patient consent (Request Nos. 12 and 13) are also wholly unnecessary to an investigation into improper billing premised on the notion that a hospital might seek to hide the true nature of the care provided. If any patient records were needed, anonymized records would suffice.

*Second*, even if the government's objective was to uncover off-label drug *promotion* by manufacturers (as opposed to permissible off-label *use* by doctors), certain requests are not relevant to that type of investigation. For instance, Request No. 1 seeks numerous personnel files, and Request Nos. 11-13 seek personally identifiable documents and communications relating to minor patients who have received gender-affirming care in the form of puberty blockers or hormone therapy. This has nothing to do with potential off-label drug promotion by manufacturers.

## III.    THE SUBPOENA REQUESTS ARE OVERBROAD, VAGUE, AND UNDULY BURDENSOME SUCH THAT THE SUBPOENA IS NOT ADEQUATELY DESCRIBED AND IS NOT REASONABLE AND WOULD, AT THE VERY LEAST, NEED TO BE SUBSTANTIALLY NARROWED

An administrative subpoena must be quashed if it "threatens to unduly disrupt or seriously hinder normal operations of a business." *United States v. Joint Active Sys., Inc.*, 2020 WL 9747630, at *4 (D. Mass. May 20, 2020), *report & recommendation. adopted*, 2020 WL 9748373 (D. Mass.

Oct. 7, 2020). Moreover, a court considering a motion to quash must "balanc[e] the likely relevance of documents against the burden of their production." *Doe*, 253 F.3d at 268. A subpoena must be "suitably specific and properly limited in scope," *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000), as the government is not permitted to "rummage through ... office files ... in the hope of perchance discovering information" that would result in liability, *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973). The subpoena here is an invasive fishing expedition that will undoubtedly disrupt BCH from providing confidential and effective care to its patients.

The burden imposed by the subpoena here far outweighs any likely relevance of documents to a lawful purpose, which, as explained *supra* pp. 12-17, there is none. The subpoena includes 15 requests seeking documents and information since January 1, 2020 and across all facets of BCH, including billing, administrative, patient, physician, and training records and communications. Its overbreadth is apparent at the outset. For instance, the subpoena defines its target as Children's Hospital Corporation d/b/a Boston Children's Hospital as well as "[a]ll of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part." Ex. 1. Moreover, the subpoena defines "Employee" to include "any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants" who have done work for BCH on a "full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid." *Id.* Moreover, the specific requests are not limited in any reasonable way; rather, they seek "any" and "all" documents within the broadly formulated descriptions. *Id.*

But most egregiously, the subpoena is overly burdensome because it seeks sensitive patient medical records and other highly confidential materials. For instance, the subpoena seeks personal

19

health information in the form of billing records, communications among physicians, documents regarding patients' identification (including "by name, date of birth, social security number, address, and parent/guardian information"), documents relating to patients' "clinical indications, diagnoses, or assessments" that formed the basis for prescribing medications, and all documents relating to informed consent, patient intake, and parent or guardian authorization for certain medical treatments. *E.g.*, Request Nos. 2-4, 11-13. The materials sought contain highly regulated protected health information, and the government has failed to provide any justification for why it needs such deeply private and personal medical information. Such disclosures would have a profound impact on the trust between patients and their providers. Forcing the release of personal health information intrudes on the private decisions made between patients and their doctors. Even the perception that such information could be disclosed undermines patients' confidence in their care. Therefore, the subpoena will plainly impose an undue burden. *See Okla. Press Publ'g Co.*, 327 U.S. at 208-11.[28]

## CONCLUSION

For the foregoing reasons, the Court should quash the administrative subpoena. At a minimum, the subpoena should be narrowed and a protective order issued to cover any records produced. BCH would request the opportunity to brief issues related to any narrowing and protective order if the Court reaches these issues.

---

[28] The subpoena is also vague insofar as it fails to define key terms in the requests, including, but not limited to, "engaged in billing activities" (Request No. 1), "internal protocols" (Request No. 2), "coding practices" (Request No. 6), "medical science liaisons" (Request No. 8), "financial or promotional arrangements" (Request No. 10), "assessments" (Request No. 12), and "medically unfavorable consequence" (Request No. 15).

Dated:  July 8, 2025                    Respectfully submitted,


/s/ Joshua S. Levy                      /s/ Amanda Masselam Strachan
Joshua S. Levy                          Amanda Masselam Strachan
BBO# 563017                             BBO# 641108
ROPES & GRAY LLP                        WILMER CUTLER PICKERING
800 Boylston Street                       HALE AND DORR LLP
Boston, MA 02119                        60 State Street
Telephone:  (617) 951-7000              Boston, MA 02109
joshua.levy@ropesgray.com               Tel: (617) 526-6000
                                        Fax: (617) 526-5000
Douglas Hallward-Driemeier              amanda.masselamstrachan@wilmerhale.com
BBO# 627643
ROPES & GRAY LLP                        Boyd Johnson*
2099 Pennsylvania Avenue                Alan Schoenfeld*
Washington, DC 10036                    WILMER CUTLER PICKERING
Telephone:  (202) 508-4600                HALE AND DORR LLP
douglas.hallward-                       7 World Trade Center
driemeier@ropesgray.com                 250 Greenwich Street
                                        New York, NY 10007
Brian R. Blais                          Tel.: (212) 230-8800
BBO# 660601                             Fax: (212) 230-8888
ROPES & GRAY LLP                        boyd.johnson@wilmerhale.com
1211 Avenue of the Americas             alan.schoenfeld@wilmerhale.com
New York, NY 10036
Telephone:  (212) 596-9090              Brian M. Boynton*
brian.blais@ropesgray.com               WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                        2100 Pennsylvania Avenue NW
                                        Washington, DC 20037
                                        Tel.: (202) 663-6000
                                        Fax: (202) 663-6363
                                        brian.boynton@wilmerhale.com

                                        *pro hac vice application forthcoming

                                        Counsel for Plaintiff The Children's Hospital
                                        Corporation d/b/a Boston Children's Hospital

**LOCAL RULE 7.1 CERTIFICATION**

I, Amanda Masselam Strachan, certify that on July 7, 2025, the parties conferred in good faith to resolve or narrow the issues presented by this motion and were unable to resolve or narrow the issues.

*/s/ Amanda Masselam Strachan*
Amanda Masselam Strachan

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2025, the foregoing was filed under seal with the Clerk of the Court via electronic mail, and that a copy was served on counsel for the Defendant via electronic mail and First-Class US Mail.

*/s/ Amanda Masselam Strachan*
Amanda Masselam Strachan
BBO# 641108
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
amanda.masselamstrachan@wilmerhale.com

22