UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE ADMINISTRATIVE SUBPOENA NO. 25-1431-019 | Case No.: 1:25-MC-91324-MJJ<br><br>GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ALTER OR AMEND |

The Government respectfully moves under Federal Rules of Civil Procedure 59(e) and 60(b) to alter or amend the Court's judgment. The Court made four manifest errors in its recent opinion quashing the subpoena, each of which provides an independent basis to revise its opinion and deny BCH's motion to quash: *First*, the Court manifestly erred by shifting the burden of proof to the Government. *Second*, the Court manifestly erred by heightening the burden on the Government in a manner contrary to law. *Third*, the Court manifestly erred by failing to provide the Government an opportunity to make a showing under the Court's new framework—a showing the Government can amply make, as demonstrated by this filing. *Fourth*, the Court manifestly erred by making a finding of bad faith not supported by the record.

## ARGUMENT

"Rule 59(e) itself does not state the grounds on which relief under the rule may be granted, and the district courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend under Rule 59(e). That discretion requires a balancing of the need for finality of judgments with the need to render a just decision." *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004). One circumstance that warrants Rule 59(e) relief is a manifest error of law, *id.*, and a motion for reconsideration should also be granted "if the court

1

'has patently misunderstood a party . . . or has made an error not of reasoning but apprehension.'" *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008) (quoting *Sandoval Diaz v. Sandoval Orozco,* 2005 WL 1501672, at *2 (D.P.R. June 24, 2005)).

Under Rule 60(b), a court "may relieve a party or its legal representative from a final judgment, order, or proceeding" for six specified reasons, including "mistake, inadvertence, surprise, or excusable neglect." *Triantos v. Guaetta & Benson, LLC*, 52 F.4th 440, 445 (1st Cir. 2022)

### 1. The Court Improperly Shifted the Burden to the Government and Repeatedly Relieved BCH of Its "Heavy" Burden to Prove the Entire Subpoena Is Invalid.

The Government's burden to show that an administrative subpoena should be enforced "is a slight one," and the burden of a subpoena recipient to avoid enforcement "is a heavy one." *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1444 (10th Cir. 1985). This Court acknowledged that the burden of resisting an administrative subpoena is on the recipient, Opinion at 9-10, but the Court erred when it did not hold BCH to its proof.

The Government has not filed a lawsuit or otherwise requested relief from the Court, and it is unclear what showing BCH made as the movant that shifted any burden to the Government in the first place. Rather than performing an assessment of BCH's showing or even stating what such a showing would be, the Court "first assessed" "whether the Government has made its *prima facie* showing of proper purpose," Opinion at 10—but the Court first performed no such assessment of BCH's evidence or even stated what such a showing would be. This inversion of the burden of proof requires the Court to reconsider its judgment. The Supreme Court has squarely held that the burden of showing an improper purpose of an administrative subpoena lies with the movant, and that burden is a "heavy" one. *United States v. La Salle Nat'l Bank*, 437 U.S.

2

298, 316 (1978). Yet the Court did not identify how BCH had met its "heavy" burden of showing an improper purpose before analyzing whether the Government had made a sufficient showing of proper purpose. This was manifest error.

BCH bore the burden of proof throughout the proceeding as the movant to identify how the *entire subpoena* was unauthorized. The Court relieved BCH of this burden by requiring the Government to prove at the outset that "the information sought by the subpoena is limited to [] potential healthcare offenses." Opinion at 11. This is a manifest error because BCH as the movant had the "heavy" burden of showing that *each request* in the subpoena was not related to a proper purpose.

Moreover, as a factual matter and manifestly contrary to the Court's findings, Opinion at 11-12, the Government provided much more than its "self-proclaimed say-so" that it is conducting an appropriately focused investigation of federal healthcare offenses, but the Court misapprehended the factual record.[1] Fed. R. Evid. 1101(d)(3) (stating that the Federal Rules of Evidence do not apply in "miscellaneous proceedings"). Items before the Court include:

- The Attorney General ordered the Civil Division's [Enforcement and Affirmative Litigation Branch],[2] of which the undersigned is an Assistant Director, to "undertake appropriate investigations of any violations of the Food, Drug, and

---

[1] Unlike a typical administrative subpoena matter, in which the Government may need to explain an investigation to a Court because the investigation is arcane or non-public—or the subpoena recipient is a private individual whose relationship to the matter is unestablished or opaque—all of the facts and laws supporting this subpoena are public, obvious, and out in the open. To the extent the salient facts are not public, BCH itself put those facts in the record.

[2] The Consumer Protection Branch's relevant authorities have recently been transferred to the Enforcement Section of the newly created Enforcement and Affirmative Litigation Branch.

- Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Opinion at 3-4.

- The Assistant Attorney General issued a memorandum directing the Civil Division, of which the Enforcement and Affirmative Litigation Branch is a component, to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's directive]." *Id*.

- The Assistant Attorney General issued the administrative subpoena in question to BCH as part of the investigation described above. Opinion at 4.

- The subpoena was procedurally proper. Opinion at 10-11.

- BCH is "one of the largest leading pediatric hospitals in the nation." Opinion at 2.

- BCH prescribes and/or provides non-FDA-approved gender-related pharmaceuticals to children at its gender clinic. *Id*.

- Causing the distribution of unapproved drugs can be an FDCA violation, which can be a federal health care offense. 21 U.S.C. § 331(d); 18 U.S.C. § 24.

These undisputed facts paint a clear picture: the Attorney General has ordered an investigation of potential FDCA health care offense violations committed in the course of gender-related care for minors, BCH provides such care and uses federally-regulated drugs in an off-label manner while providing such care, and the Assistant Attorney General for the Civil

Division issued a procedurally proper subpoena in furtherance of this investigation. At the very least, BCH as the movant did not carry its "heavy" burden to disprove *any* of the bulleted facts above.

### 2. The Court Erroneously Heightened the Burden on the Government

"[A]s long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced," *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996) (collecting cases). The Court did *not* find that the agency's assertion of authority was "obviously apocryphal," and in fact the Court found that DOJ is authorized to investigate healthcare fraud and at least some aspects of off-label use of pharmaceuticals. Opinion at 11-12.

Because the Court found that DOJ is allowed to send a subpoena to BCH to investigate these potential offenses, the agency's assertion of authority is not "obviously apocryphal," and the result of this proceeding should have been simple: The subpoena should not have been quashed. Indeed, the Court's stated concern that the breadth of some of the requests exceeds the agency's authority sounds in the relevance of *those requests*—not the subpoena's overall viability. The Court should have evaluated the subpoena and the information in the record against what it found to be the subpoena's potentially authorized purpose.

The Court also applied the wrong standard by misreading *In re Sealed Case*, 42 F.3d 1412 (D.C. Cir. 1994), and *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973). At a critical juncture in its ruling, Opinion at 12, the Court established a contrary-to-law rule that the Government may not send a subpoena in a "fishing expedition" to go on a "rambling

5

exploration" that "cast[s] about for potential wrongdoing." But these cases stand for no such general propositions: if they did, they would conflict with Supreme Court precedent.

Instead, the disputes in those cases relate to very specific contexts in which very specific subpoenas were issued: The dispute in *In re Sealed Case* concerned whether the Office of Thrift Supervision had statutory authority to subpoena the *personal* bank accounts of 1980s savings-and-loan executives whose accounts were not relevant to determining liability under the statute. *Theodore* rejected the IRS's use of so-called John Doe summonses to obtain hundreds or thousands of tax returns prepared by a high-volume preparer to evaluate those tax returns. In stark contrast to *Sealed Case*, this Court already determined that the Government does have the statutory authority to investigate the federal healthcare offenses under investigation, and in stark contrast to *Theodore*, the Government is statutorily limited by 18 U.S.C. § 3486(e) from using the health records it obtains to investigate patients. Those cases have very little to say about the issues here.

In contrast to the Court's misplaced reliance on the narrow relevance and scope-based holdings of those inapposite cases, *United States v. Morton Salt Co.*, 338 U.S. 632 (1950) (the Government "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"), establishes that the Government is perfectly empowered to send subpoenas within its statutory authority in order to determine whether a federal health care offense may have been committed—as it has done here with BCH, which is a large, regulated healthcare provider. The Court manifestly erred by acknowledging DOJ's authority in this space but then barring DOJ from investigating federal healthcare offenses plainly within its statutory authority.

### 3. The Court Failed to Provide the Government an Opportunity to Make a Showing Under the Court's New Standard

This Court also committed manifest error by creating a new standard for subpoena enforcement in which the Government must provide the articulable suspicions on which it based its subpoena requests, ruling that the Government should have articulated its "suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance." Opinion at 12.

This Court then compounded this manifest error by not affording the Government the opportunity to meet its newly established standard, which the Government had no reason to anticipate, much less to meet. *See, e.g.*, *Gimbel v. FDIC (In re Gimbel)*, 77 F.3d 593, 602 (2d Cir. 1996) ("articulable and individualized suspicion" generally not required to enforce an administrative subpoena). If the Court disagrees that it erred by imposing this burden on the Government, the Government respectfully submits that it should be given the opportunity to meet this new standard. *See FTC v. Gallo*, No. 653-73, 1973 U.S. Dist. LEXIS 11573, at *9 (D.D.C. Oct. 9, 1973) (ordering the Government to submit additional information about an administrative subpoena after the district court determined that the subpoena recipient had made an initial showing in its brief).

The Government is amply able to meet the Court's newly announced, heightened standard and address the Court's concerns, as demonstrated by the attached affidavit proffering a variety of facts and information to the Court. *See* Hsiao Declaration (attached). The affidavit sets out the legal and factual background for the Government's investigation as well as relevant facts about BCH and the drugs at issue. *Id*. And it describes why the Government has cause to investigate whether BCH and its associates are violating the FDCA—either directly or through a

7

conspiracy with others (e.g., with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead. *Id*. at 10-12.

To highlight two of these items: *First*, through analysis of anonymized insurance industry claims data, the Government identified hundreds of children at BCH or its affiliates since 2015 whom the data shows were first diagnosed with central precocious puberty ("CPP") at age 10 or older, including hundreds of children who were first diagnosed with CPP between the ages of 14 and 18. *Id*. at 12. Because 10 is a normal and not a precocious age for puberty, the large scale of these late diagnoses raises suspicion that BCH incorrectly diagnosed certain children with CPP in order to mislead insurance companies or others into covering puberty blockers for older children with gender dysphoria. Misleading insurance companies or others about a patient's diagnosis in order to obtain payment for off-label pharmaceuticals could form the basis of a federal healthcare offense. This suspicion is heightened by the highly non-random distribution of these facially suspect diagnoses over time. Below is a graph showing how BCH experienced a large spike of these facially suspect diagnoses from 2020-23:



On the x axis is the year of first diagnosis, on the y axis is the number of patients, and the different colors of the graph lines represent the age of the patient at first diagnosis. *Id*. at 12. The graph demonstrates the bizarre nature of this data. For example, there is no clear explanation for why BCH would go from diagnosing almost no 11-year-olds with CPP for the years 2017-19 to diagnosing 50 11-year-old patients with CPP in 2022, and it would be rational for the federal government to want to find out why—especially because such a diagnosis could be a false basis upon which to prescribe (and have payors pay for) powerful prescription medications.

*Second*, there are public statements from BCH staff that support the alarming data above and that also raise serious questions about whether BCH made false statements about pharmaceuticals and/or illegally distributed pharmaceuticals without valid prescriptions. Dr. Amy Tishelman, the former Director of Clinical Research at the gender clinic at BCH, sued BCH in Massachusetts state court for allegedly retaliating against her after she, among other things, raised concerns that BCH was rushing kids towards life-altering medicalization, including puberty blockers. Complaint, *Tishelman v. Boston Children's Hospital*, No. 2084CV2310 (Suffolk Cty. Sup. Ct. filed Oct. 7, 2020). At trial, Dr. Tishelman testified under oath that BCH dramatically cut the length of psychological assessments before prescribing minors with puberty blockers or cross-sex hormones. Hsiao Decl. at 13. According to Dr. Tishelman's testimony, prior to 2017, assessment times were 20 hours. *Id*. A few years later, assessment times had been reduced to two and a half hours, a move she characterized as "reckless."[3] *Id*.

---

[3] The Government notes that the dramatic slashing of assessment times appears to coincide with or immediately precede the dramatic surge in suspect CPP diagnoses described in the preceding paragraph.

9

Furthermore, Dr. Jeremi Carswell, one of the current leaders of the gender clinic at BCH, said at a conference presentation in 2020 that puberty blockers were being handed out "like candy." *Id*. Dr. Carswell also presented a slide at that conference suggesting some risks of puberty blockers, including "brain maturation," "bone density," and "fertility"—but around the same time, BCH apparently told patients on a BCH website that puberty blockers were "temporary" and "fully reversible" and "do not cause any permanent changes." *Id*. That apparently incorrect or misleading BCH website could be considered "labeling" in certain circumstances, which could form the basis of the federal healthcare offense.

In 2021, Laura Edwards-Leeper, another doctor who worked or works at BCH, wrote an op-ed in the *Washington Post* describing a number of alarming practices at gender clinics which she seems to have witnessed first-hand: Children being "rushed" into a medical pathway without appropriate psychological evaluation—far less evaluation time than required even under the WPATH standards of care—including being prescribed puberty blockers and hormones by endocrinologists who have not actually sought informed consent. *Id*.

All of these items constitute the type of articulable suspicion for federal healthcare offenses that the Court required of the Government; because the Government could not have anticipated the "articulable suspicion" requirement the Court imposed, the Court should revise its opinion and find that the Government meets the standard.

**4. The Court's Bad Faith Finding Is Manifestly Erroneous**

Finally, the Court manifestly erred when it incorrectly assumed that the subpoena is motivated "only by bad faith" and "to harass and intimidate" hospitals. Opinion at 14. The Attorney General did not order such an unlawful investigation, there is not a single piece of

record evidence indicating that she did, and the Court's contrary conclusion is neither supported by the facts nor by the statutes relied upon by the government in pursuing the information it seeks.

As expressed by the Attorney General and the President, the Executive Branch has advanced a policy goal of ending gender-related pharmaceutical and surgical treatment of minors. The Executive Branch can choose to support that policy goal—a policy goal that the Supreme Court recognizes is rational, *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1835-36 (June 18, 2025)—in a variety of ways. This includes, of course, by conducting lawful and appropriate investigations to determine if federal law has been violated by individuals engaging in potential misconduct. Government officials, like all human beings, often have multiple valid reasons for performing actions: The Attorney General wants to investigate federal healthcare offenses (including those committed in connection with the provision of gender-related care to minors) at the same time she wants to curtail the practice of gender-related pharmaceutical and surgical care to minors overall. Nothing about that situation is improper, mutually exclusive, pretextual, or even remarkable—BCH did not even attempt to address why the Attorney General having both goals is impermissible. The fact that the Attorney General conceives of federal law as potentially being in conflict with Massachusetts law also seems unremarkable.

Moreover, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's

11

conclusion"). "Relatedly, a court may not set aside an agency's decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.*

Neither is the Court's finding of "harass[ment]" supported by the record. The federal government often sends subpoenas to investigate practices that may or may not violate federal law, and there is the obvious possibility that an entity receiving such a subpoena will cease unlawful activities related to a controversial practice before any enforcement action is litigated. Other courts have recognized this phenomenon and have correctly found it unremarkable. *Solis v. Forever 21, Inc.*, No. 12-09188, 2013 U.S. Dist. LEXIS 64462, at *21 (C.D. Cal. Mar. 7, 2013).

Instead of attaching the presumption of regularity and propriety that it must to the Attorney General and Assistant Attorney General's actions, *Banks v. Dretke*, 540 U.S. 668, 696 (2004), the Court assumed that the Attorney General or the Assistant Attorney General gave orders and signed subpoenas to harass and intimidate hospitals in a way that is "unrelated to investigating fraud or unlawful off-label promotion." In order to have done so, of course, these officials would not only need have lied in their official memos about the "appropriate[ness]" of the investigation, but they would also need to disbelieve their own justifications for these actions—that is, that at least some aspects of pharmaceutical and surgical gender-related care for minors likely violate federal law. But BCH did not ask the Court to make such findings, nor did it present any evidence in support of them, and the Court erred in casually finding that the Attorney General of the United States lied in an official memorandum.

Instead, BCH and the Court *credited* the Attorney General's statements that she wants to end pharmaceutical and surgical gender-related treatments for minor children as accurately reflecting her state of mind, but then inexplicably *discredited* her order of an "appropriate" investigation into federal health care offenses as being pretextual, and then *ignored* her explanation of how off-label uses of pharmaceuticals and misrepresentations about their effects could violate federal health care law. The Court did not explain why it chose to credit one part of the Attorney General's statement and reject or ignore the others. This was manifest error and should be corrected.

## CONCLUSION

The Government respectfully requests that the Court revise its opinion and deny BCH's motion to quash.

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 /s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT DAHLQUIST
Trial Attorney

U.S. Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044

                                  Tel: (202) 353-4218
                                  patrick.r.runkle@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I served the foregoing Memorandum in Opposition via ECF to counsel of record.

Dated this 7th Day of October, 2025.

                                                                         */s/ Patrick R. Runkle*
                                                                         PATRICK R. RUNKLE