**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In Re: Administrative Subpoena No. 25-1431-019 | Civil Action No. 1:25-mc-91324-MJJ |

**BOSTON CHILDREN'S HOSPITAL'S OPPOSITION TO**
**THE GOVERNMENT'S MOTION TO ALTER OR AMEND**

# **TABLE OF CONTENTS**

Page

LEGAL STANDARD ........................................................................................................2

ARGUMENT ...................................................................................................................3

I.     DOJ's Motion Is Procedurally Improper......................................................3

II.    The Court Correctly Applied The Established Burden Of Proof...................4

III.   DOJ's Attempt To Introduce New Evidence Is Untimely And Improper ......8

IV.    DOJ's Newly Presented Evidence Would Not Establish A Proper Purpose ................11

    A.     DOJ's Novel Theories Of FDCA Liability Are Contrary To Settled Law ............11

    B.     DOJ's Novel Theories Of FDCA Liability Would Devastate Patient Care ..........15

    C.     DOJ's Alleged Billing Violations Are Beyond The Scope Of DOJ's Authority Under The Subpoena..........................................................16

V.     Even If DOJ Met Its Initial Burden, There Is Extensive Evidence Of Bad Faith........18

CONCLUSION.................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ...............................13

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) .......................................................15

*EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928 (8th Cir. 1985)........................5

*Fisher v. Kadant, Inc.*, 589 F.3d 505 (1st Cir. 2009)..................................................2, 3

*FTC v. Bisaro*, 2010 WL 3260042 (D.D.C. July 13, 2010)......................................19, 20

*Gonzales v. Oregon*, 546 U.S. 243 (2006).............................................................12, 18

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707
(1985)...............................................................................................................12, 18

*In re Administrative Subpoena No. 25-1431-019*, --- F.Supp.3d ---, 2025 WL
2607784 (D. Mass. Sept. 9, 2025) ............................................................ *passim*

*In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412 (D.C. Cir. 1994)..........................7

*Kemp v. United States*, 596 U.S. 528 (2022) ..............................................................3

*Marie v. Allied Home Mortgage. Corp.*, 402 F.3d 1 (1st Cir. 2005) ..............................2

*Martinez v. Hubbard*, 172 F. Supp. 3d 378 (D. Mass. 2016) ......................................3

*Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006)..........................................2

*Pomerleau v. West Springfield Public Schools*, 362 F.3d 143 (1st Cir. 2004) ...............2

*Quality Cleaning Products R.C., Inc. v. SCA Tissue North America, LLC*,
794 F.3d 200 (1st Cir. 2015)...................................................................................8

*SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118 (3d Cir. 1981) .......................19

*U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718 (1st Cir. 2022)..............................7, 11

*U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310 (D. Mass. 2011).............14

*United States v. Balanced Financial Management, Inc.*, 769 F.2d 1440 (10th Cir.
1985) ..............................................................................................................10

*United States v. Facteau,* 89 F.4th 1 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 137 (2024)....................................................................................................................14

*United States v. Fensterwald*, 553 F.2d 231 (D.C. Cir. 1977)......................................19

*United States v. Mitcheltree*, 940 F.2d 1329 (10th Cir. 1991)......................................18

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950).............................................7, 8

*United States v. Powell*, 379 U.S. 48 (1964) ...............................................5, 7, 8, 9

*United States v. Theodore*, 479 F.2d 749 (4th Cir. 1973)..............................................7

*United States v. Westinghouse Electric Corp.*, 788 F.2d 164 (3d Cir. 1986) .................6

*United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813 (8th Cir. 2012)...................................................................................................5

*Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) ..................14

*West Virginia v. EPA*, 597 U.S. 697 (2022)................................................................12

## DOCKETED CASES

*American Academy of Pediatrics v. Kennedy,* No. 1:25-cv-11916 (D. Mass)...............14

*Penelow v. Janssen Products, LP*, No. 25-1818 (3d Cir.) ...........................................14

## STATUTES AND RULES

18 U.S.C.
    § 24................................................................................................................17
    § 3486.........................................................................................................7, 17

21 U.S.C.
    § 331.......................................................................................................17, 18
    § 333.......................................................................................................17, 18
    § 396.......................................................................................................13, 14

Fed. R. Civ. P.
    Rule 6..............................................................................................................4
    Rule 59 ...................................................................................................*passim*
    Rule 60 ...................................................................................................*passim*

D. Mass L.R.
    Rule 5.4...........................................................................................................4
    Rule 7.1...........................................................................................................3

## OTHER AUTHORITIES

FDA, *Guidance for Industry: Responding to Unsolicited Requests for Off-Label Information about Prescription Drugs and Medical Devices*, (Dec. 2011), https://www.fda.gov/media/82660/download ..................................................13

FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label ..................................................................................................13

Ruishan Liu et al., *Systematic Analysis of Off-Label and Off-Guideline Cancer Therapy Usage in a Real-World Cohort of 165,912 US Patients*, Cell Reports Medicine (Mar. 2024), /https://www.sciencedirect.com science/article/pii/S2666379124000673 ..................................16

Joelle Nelson et al., *Consensus Recommendations for Use of Maintenance Immunosuppression in Solid Organ Transplantation*, Pharmacotherapy (Apr. 2022), https://accpjournals.onlinelibrary.wiley.com/doi/epdf/10.1002/phar.2716 ..................................16

Kathleen Neville et al., *Off Label Use of Drugs in Children*, 133 Am. Acad. of Pediatrics 563 (reaffirmed Nov. 2020), https://publications.aap.org/pediatrics/article/133/3/563/32274/Off-Label-Use-of-Drugs-in-Children ..................................16

Angelica Stabile, *Common Heart Drug Doubles as Off-Label Anxiety Aid, Driving Surge in Prescriptions*, Fox News (Sept. 12, 2025), https://www.foxnews.com/health/common-heart-drug-doubles-off-label-anxiety-aid-driving-surge-prescriptions ..................................16

*Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81 (2019) ..................................13

The Department of Justice ("DOJ") provides no persuasive grounds for the extraordinary relief sought in its motion to amend or alter the Court's judgment quashing the subpoena to the Children's Hospital Corporation d/b/a Boston Children's Hospital ("BCH").  *See In re Administrative Subpoena No. 25-1431-019*, --- F.Supp.3d ---, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) (Dkt. 33) ("Op.").  The Court carefully reviewed the overwhelming evidence that the subpoena was issued for an improper purpose:  to try to end the provision of gender-affirming care ("GAC") even where it is permitted as a matter of state law.  The Court then applied settled legal principles to quash the subpoena.  DOJ has not come close to meeting its heavy burden to obtain relief under Federal Rules of Civil Procedure 59(e) or 60(b).

Putting aside that this motion was filed late and DOJ failed to engage in the required meet and confer, the motion is meritless.  Contrary to the government's assertions, the Court made no errors in the legal framework it applied.  Under longstanding Supreme Court precedent cited in BCH's motion to quash, a subpoena cannot be enforced if it was issued for an improper purpose and the government is required to make a prima facie showing of validity to enforce a subpoena.  That framework was not "new," and it does not improperly impose a heightened burden on the government.  Nor did the Court err in any respect in applying these long-settled principles.  The Court properly quashed the subpoena after analyzing the extensive evidence of the subpoena's improper purpose and weighing it against the complete absence of any evidence to the contrary offered by the government.

There is no basis to allow DOJ to rely on the newly submitted Declaration of Lisa Hsiao, Dkt. 37 ("Hsiao Declaration" or "Hsiao Decl.").  DOJ could have submitted that declaration or other evidence of a proper purpose when it opposed the motion to quash, which set forth the standards this Court later applied.  But DOJ elected instead to submit no evidence, arguing only

that it did not need to.  Nor did the government ask for an opportunity to submit the declaration (or anything else) after the Court raised its concerns at argument, or to supplement the record in the intervening weeks before the Court issued its decision.  The government should not be permitted to belatedly seek to manufacture a basis for its subpoena.

Even if the Court were to consider the Hsiao Declaration, its purported justifications for the subpoena are so flawed as to be patently pretextual, providing further support for this Court's conclusion that the subpoena was issued for an improper purpose.  The novel and radically expansive theories of liability described in the declaration are contrary to well-established limitations under the Federal Food, Drug, and Cosmetic Act ("FDCA") and would subvert the States' primary responsibility for regulating the practice of medicine without any suggestion by Congress that it intended to upset this key feature of our federalism.  Those theories would upend the practice of medicine throughout the United States and potentially criminalize common practices of off-label prescription and use that in many instances reflect the standard of medical care.  Finally, the Court's finding of bad faith is amply supported by evidence in the record.

## LEGAL STANDARD

Movants seeking relief under either Rule 59(e) or 60(b) face a heavy burden.  Under either rule, relief is "extraordinary" and should be granted only "sparingly" so as not to undermine the finality of judgments.  *Fisher v. Kadant, Inc.*, 589 F.3d 505, 512 (1st Cir. 2009) (Rule 60(b)); *see Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006) (Rule 59(e)).  Under Rule 59(e), a movant must "either clearly establish a manifest error of law or must present newly discovered evidence."  *Pomerleau v. West Springfield Pub. Schs.*, 362 F.3d 143, 146 n.2 (1st Cir. 2004) (internal quotation marks omitted).  "[I]t is very difficult to prevail on a Rule 59(e) motion."  *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 7 n.2 (1st Cir. 2005).  Success under Rule 60(b) similarly

"requires more than merely casting doubt on the correctness of the underlying judgment." *Fisher*, 589 F.3d at 512. A movant must "at a bare minimum" establish that "exceptional circumstances exist, favoring extraordinary relief." *Id.* The rule lists "a limited set of circumstances" justifying relief, *Kemp v. United States*, 596 U.S. 528, 533 (2022), including for "mistake, inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1). No such exceptional circumstances are present here.

## ARGUMENT

### I.     DOJ'S MOTION IS PROCEDURALLY IMPROPER

DOJ's motion can and should be denied based on unexcused procedural errors. DOJ both failed to meet and confer with BCH as required by the local rules and missed the required filing deadline. These rules are not optional and, at a minimum, a party who fails to comply with the Court's rules must seek leave of court for such violations.

First, DOJ failed to comply with the Court's meet and confer requirement before filing the motion. *See* Local Rule 7.1(a)(2) ("No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue."). Failure to comply with Local Rule 7.1 "alone would be reason enough to deny [plaintiff's] motion." *Martinez v. Hubbard*, 172 F. Supp. 3d 378, 383, 385 (D. Mass. 2016) (noting that a "Local Rule 7.1 certification is not an empty exercise[;] Local Rule 7.1 serves a meaningful dual role: it fosters discussion between parties about matters before they come before the court, and it preserves scarce judicial resources").

DOJ not only failed to meet and confer; rather, it inaccurately represented that it *had* met and conferred. Specifically, DOJ certified that on July 7, 2025—three months before the government filed this motion—the "parties conferred in good faith to resolve or narrow the issues in dispute and were unable to resolve or narrow the issues." It should be obvious that a July meet

and confer could not have addressed the government's arguments with respect to an October motion to reconsider a September ruling.

DOJ also missed the filing deadline for a timely motion to reconsider. Rule 59(e) sets a 28-day deadline for a motion to alter or amend the judgment. As a consequence, the last day for filing the motion was October 7. Rule 6 specifies that the deadline to make a timely filing on the "last day" can be set by local rule. *See* Fed. R. Civ. P. 6(a)(4). Local Rule 5.4(d) states that "[a]ll electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day." The government's motion—filed at 10:31 p.m. on the 28th day after this Court's decision—therefore missed the deadline to file a motion to reconsider. The government has not offered any justification for its failure to comply with this Court's rule or otherwise argued that an extension is warranted.

In a proceeding where the good faith of the government is at issue and where the government's failure to abide by the rules governing use of criminal investigatory procedures is challenged, DOJ's failure to comply with the Local Rules and lack of candor about its compliance are noteworthy.

## II. THE COURT CORRECTLY APPLIED THE ESTABLISHED BURDEN OF PROOF

DOJ claims (Dkt. 36 ("Mem") at 1-2) that the Court erred by imposing a new and heightened burden on the government, but this argument is contradicted by the Opinion itself, which cited and correctly applied the well-settled standards that BCH invoked in its motion to quash. Indeed, the argument is also inconsistent with DOJ's own brief, which states that the government has the "burden to show that an administrative subpoena should be enforced." Mem. 2. Consistent with longstanding and evidently undisputed law, the Court required DOJ to make only a "prima facie showing of proper purpose" before assessing whether BCH could rebut that showing by demonstrating the subpoena was issued for an improper purpose. Op. 10 ("In line

with these principles, I first assess whether the Government has made its prima facie showing of proper purpose, and then whether BCH has shown that the subpoena was issued for an improper purpose.").  That two-step framework is fully supported by the governing case law that BCH invoked in its motion and that is cited throughout the Court's Opinion.

In *United States v. Powell*, the Supreme Court held that while the IRS Commissioner "need not meet any standard of probable cause to obtain enforcement of his summons, … [h]e must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed … ." 379 U.S. 48, 57-58 (1964).  Only after that did the taxpayer bear the "burden of showing an abuse of the court's process" through evidence suggesting the IRS summons had been issued "for any other purpose reflecting on the good faith of the particular investigation."  *Id.* at 58.

The courts of appeals, including the First Circuit, have dutifully applied this basic principle, as the Court observed.  In *United States v. Comley*, the First Circuit assessed first whether the government made a prima facie showing that it subpoenaed Comley for a proper purpose before the court assessed Comley's argument that the subpoena was "motivated only by bad faith." 890 F.2d 539, 541-543 (1st Cir. 1989).  Other circuits have also followed this two-step approach, putting the initial burden on the government to show a subpoena was issued for a lawful purpose. *See, e.g.*, *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012) ("If an agency has satisfied these requirements for an administrative subpoena, the burden shifts to the respondent to show that judicial enforcement 'would amount to an abuse of the court's process.'" (quoting *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 931 (8th

Cir. 1985)); *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-169 (3d Cir. 1986) (similar).

This Court followed that clear law. After laying out the "[n]umerous statements by the Administration, executive orders, and memorandums, detail[ing] the Administration's goal of ending GAC," the Court concluded that DOJ acted with this improper purpose in mind. *See* Op. 9-14. Beyond the executive orders and memos, the Court highlighted statements made by the Deputy Assistant Attorney General supervising this investigation that DOJ is "working on" ending GAC "even in blue states" and White House boasts about several hospitals ceasing to provide GAC. Op. 13. The Court also observed that the breadth of the records sought—"an astonishingly broad array of documents and information that are virtually unlimited in scope" and seek "information seemingly unrelated to investigating fraud or unlawful off-label promotion"— underscored that the Administration was seeking to stop GAC, not to pursue a legitimate investigation, as the subpoena's sweeping requests are untethered to any suspicion of criminal activity. Op. 12, 14.

Faced with this mountain of evidence showing the subpoena's improper purpose, DOJ offered nothing to the contrary: "The government has not submitted any affidavits or other evidence to show proper purpose." Op. 11. To conclude that the subpoena had an improper purpose, all the Court had to do was to take DOJ at its word. At argument, counsel for the government admitted that the purpose of the investigation was to end GAC: "[T]he executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about … . [T]hat's exactly what this investigation is about … ." Oral Arg Tr. 25. In light of the extensive evidence of the government's improper purpose, the Court concluded that the subpoena should be quashed at both steps of the

two-step framework: "the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith." Op. 14. The Court did not misapply the burden here; DOJ simply failed to meet it.

DOJ contends that it was only required to invoke its statutory authority to enforce the subpoena, and that requiring further justification "is contrary to law." Mem. 1, 5-6. But citing a statute does not give the government carte blanche to request whatever records it likes, no matter the actual purpose behind the subpoena. Rather, as the Supreme Court, the First Circuit, and this Court have all recognized, a subpoena must flow from an authorized investigatory purpose and its requests must relate to that purpose—in this instance, the investigation of potential "federal health care offenses," 18 U.S.C. § 3486(a)(1)(A). *See* Op. 8-9; Dkt. 4 at 15, 18-19 (BCH motion); *Powell*, 379 U.S. at 57-58; *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a 'fishing expedition' … , and where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced."); *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1415, 1418 (D.C. Cir. 1994).

In light of this requirement, and the overwhelming evidence of an improper purpose here, the Court did not manifestly err in finding that DOJ had failed to articulate at least "an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance" in order to support the subpoena's "astonishingly broad" requests. Op. 12. Having conceded at oral argument that it was "not aware of [allegations] specific" to BCH or even Massachusetts, Oral Arg. Tr. 37, DOJ argues (at 5-6) that the government "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950)). But even *Morton Salt*

does not suggest that the government can pursue investigations entirely unconnected to suspected violations of the law. There, the Supreme Court wrote that the government's investigative authority allows it to "take steps to inform itself as to whether there is *probable* violation of the law." *Morton Salt Co.*, 338 U.S. at 643 (emphasis added). And later, the Court confirmed what should be obvious: "Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Id.* at 652. While *Morton Salt* rejected "probable cause requirements" for administrative subpoenas, *see Powell*, 379 U.S. at 57, the case condemns rather than condones suspicion-less subpoenas pursued for an improper purpose. *Morton Salt* recognized that subpoenas will be enforced only to the extent "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." 338 U.S. at 652. Its holding is entirely consistent with the standards applied by this Court. Op. 14.

## III.  DOJ'S ATTEMPT TO INTRODUCE NEW EVIDENCE IS UNTIMELY AND IMPROPER

DOJ's attempt to rely on the newly submitted Hsiao Declaration should be rejected. A Rule 59(e) motion "does not provide a vehicle for a party to undo its own procedural failures or to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment." *Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 208 (1st Cir. 2015) (citation and internal quotation marks omitted). DOJ provides no valid basis for submitting new evidence with its motion for reconsideration or any explanation to the Court as to why this evidence is being submitted now as part of a motion to reconsider. That evidence either was previously available or is necessarily an improper post-hoc justification for the subpoena. Either way, it cannot be considered.

DOJ's primary argument is that it can submit new evidence because the Court created a "new standard" for enforcing a subpoena. Mem. 7. But as explained above, the Court applied

well-established law in determining DOJ had failed to establish the subpoena was issued for a proper purpose. *See supra* Part II. The burden of proof was settled by the Supreme Court in 1964 in *Powell* and confirmed by the First Circuit in *Comley* in 1989. Moreover, the standard the Court applied was set out in BCH's motion to quash. DOJ was obligated to meet that standard, even if it did not agree with BCH's arguments; it does not get to lose on the law (under well-settled precedent) and then argue for a do-over.

DOJ is thus wrong to argue that the Court failed to give it an opportunity to meet its burden under the governing standards. Mem. 7. DOJ had the benefit of seeing BCH's motion to quash and two weeks to respond. As noted, BCH's motion set forth the applicable standards. *See* Dkt. 4 at 12, 14-15 (citing *Powell*). The motion also detailed the many reasons to believe DOJ's investigation was motivated by an improper purpose—to end the provision of GAC even though it is lawful under the laws of the Commonwealth of Massachusetts. *See id.* at 12-17. DOJ's opposition contained extensive explanation of the purpose of the subpoena and why it believed that purpose to be proper. *See* Dkt. 21 at 10-13. DOJ had yet more opportunities to articulate the purpose underlying the subpoena during oral argument, and it left no doubt: "[T]he executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about … . [T]hat's exactly what this investigation is about … ." Oral Arg. Tr. 25; *see also id.* at 24 (stating the subpoena's purpose is for DOJ members "to obtain documents from the hospital to evaluate whether the hospital, it might be a witness, it might be a subject, it might be a target, whether federal health care offenses have taken place").

It is typical for the government to respond to a motion to quash a subpoena with evidence, like affidavits, that provide information about the purpose of or basis for the investigation. Indeed,

one case cited by DOJ (Mem. 2) observes: "'The requisite showing [of a subpoena's legitimate purpose] is generally made by affidavit of the agent who issued the summons and who is seeking enforcement.'" *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1443 (10th Cir. 1985). DOJ cannot claim to be surprised that such an affidavit might be necessary here, especially in light of the arguments that BCH made in its motion to quash about the subpoena's improper purpose. *See* Dkt. 4 at 12-17. Instead, DOJ reached the conclusion that an affidavit was not necessary. *See* Oral Arg. Tr. at 23 ("[W]e don't need an affidavit here because the movant put in the basis for the investigation as evidence … ."). That was its strategic prerogative. But while DOJ now regrets that it did not take advantage of the ample opportunities it had to try to meet its burden, this does not mean those opportunities were not available and provides no justification for relief under Rules 59(e) or 60(b).

Nor does DOJ explain why it could not have presented the assertions in the Hsiao Declaration to the Court prior to judgment. DOJ does not contend that it is presenting "newly discovered" evidence. Although the Hsiao Declaration provides almost no information about the underlying support for the new assertions it makes, the alleged insurance claim data the Declaration references is said to date back to 2015 and to end in 2024. Mem. 8; Hsiao Decl. ¶ 35. Likewise, the public statements DOJ now raises are all from 2024 and earlier—months and years in advance of the issuance of the subpoena and subsequent briefing. Mem. 9-10; Hsiao Decl. ¶¶ 36-38. The Hsiao Declaration also refers to various studies, mostly in Europe, all of which have been available online for months or years. Hsiao Decl. ¶¶ 24-29. All of this information was known to DOJ at the time the subpoena was issued, while the motion to quash was being briefed, and at oral argument.

Yet at oral argument, DOJ said that it was "not aware of specific" allegations related to

wrongdoing at BCH or even at any hospital in Massachusetts. Oral Arg. Tr. 37. DOJ also had no response and proffered no evidence when the Court stated that "it would be helpful, if, for example, the government had proffered something along the lines of, look, we've looked at our data and there appears to be X amount of numbers of billing codes under this code for this particular drug and that is raising an eyebrow." *Id.* at 28-29. The Hsiao Declaration therefore directly contradicts the position DOJ took on BCH-specific allegations during oral argument. *See* Hsiao Decl. ¶¶ 34-38 (describing specific allegations related to GAC provided at BCH, including facts related to billing). The inescapable conclusion from the inconsistency between DOJ's position at oral argument and the statements in the Hsiao Declaration is either that DOJ did not believe that the allegations in the Hsiao Declaration were worth presenting to the Court and told the Court there were no allegations specific to the hospital, or that the allegations are a pretextual post hoc justification in response to an adverse ruling that DOJ did not expect. Neither provides a basis for the extraordinary relief from this Court's judgment that DOJ seeks.

## IV.    DOJ'S NEWLY PRESENTED EVIDENCE WOULD NOT ESTABLISH A PROPER PURPOSE

Even if the Court were to consider the government's late submission—and it should not—the Hsiao Declaration would not establish a proper, congressionally authorized purpose. *Ricco Jonas*, 24 F.4th at 726. Instead, its manufactured justifications are so flawed as to be obviously pretextual and confirm the improper purpose underlying the subpoena.

### A.    DOJ's Novel Theories Of FDCA Liability Are Contrary To Settled Law

The Hsiao Declaration provides no basis for reconsideration because the theories of FDCA liability it sets forth are contrary to established law. In its attempt to justify investigating the practice of medicine at BCH, DOJ purports to advance two theories of FDCA violations: first, that "prescribing for unapproved uses can itself involve FDCA violations," and, second, that "implants or injectables that require administration by a physician or nurse … plac[e] healthcare providers

in the chain of distribution of that drug," meaning they could be criminally liable for off-label administration.[1]  Hsiao Decl. ¶¶ 12, 23; *see* Mem. 4.  Both theories, which were previously raised by DOJ during oral argument, *see* Oral Arg. Tr. 31-32,[2] are inconsistent with settled law and would represent a fundamental change in the balance of power between the States and federal government.  DOJ cannot conjure a justification for a subpoena by imagining a theory of criminal liability that is at odds with settled law.

Permitting the federal government to criminalize off-label prescribing and administration by doctors would drastically change the allocation of responsibility between the States and federal government to regulate the practice of medicine by allowing the federal government to intrude into the practice of medicine.  "[R]egulation of health and safety matters is primarily, and historically, a matter of local concern."  *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985).  Congress has only rarely "set uniform national standards in these areas."  *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006).  When the federal government seeks to disrupt that balance, courts look for a clear indication that Congress intended it to do so.  *West Virginia v. EPA*, 597 U.S. 697, 722-724 (2022) (citing *Oregon* as example of a "major questions case").  Here, there is no evidence that Congress intended to authorize a dramatic change in the allocation of authority between the States and federal government.  Instead, there is clear evidence that Congress did *not* intend to do that.

The FDCA expressly states that it *does not* empower the primary agency charged with enforcing the FDCA—namely, the FDA—to interfere with the authority of a medical provider to

---

[1]  DOJ even goes so far as to say that hospital officials may also face strict, vicarious criminal liability for these doctors' off-label prescriptions under the Park Doctrine.  *See* Hsiao Decl. ¶ 19.

[2]  DOJ explained that "there is a difference between writing prescriptions and dispensing medicine," indicating that only "the bare act of writing an off label-prescription" is shielded from FDA enforcement.  Oral Arg. Tr. 32.

"*prescribe* or *administer* any legally marketed device to any patient for any condition or disease within a legitimate health care practitioner-patient relationship."  21 U.S.C. § 396 (emphasis added).  The FDA's own guidance likewise consistently upholds doctors' right to engage in off-label prescription and administration for legitimate medical purposes.  For example, one guidance document states:  "[O]nce the FDA approves a drug, healthcare providers generally may *prescribe* the drug for an unapproved use when they judge that it is medically appropriate for their patient."[3]  Another guidance document notes:  "[O]nce a drug or medical device has been approved or cleared by FDA, generally, health care professionals can lawfully *use* or *prescribe* that product for uses or treatment indications that are not included in the product's approved labeling … .  [T]he FDA recognizes that these off-label uses may even constitute a medically recognized standard of care."[4]  Similarly, a formal opinion from DOJ's Office of Legal Counsel, which binds DOJ and other Executive Branch agencies, also affirms that off-label prescribing and administration is not a violation of the FDCA:  "[W]hile the FDCA bars a manufacturer or distributer from selling any drug or device for an unapproved use, physicians may, with limited exceptions, *prescribe* and *administer* FDA-approved drugs and devices for unapproved uses."[5]

This rule that off-label prescribing and administration are permissible has been recognized consistently as well by the courts, including the Supreme Court.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (Off-label use is an "accepted and necessary

---

[3]  FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (emphasis added).

[4]  FDA, *Guidance for Industry: Responding to Unsolicited Requests for Off-Label Information about Prescription Drugs and Medical Devices*, (Dec. 2011) (draft guidance for comment purposes only), https://www.fda.gov/media/82660/download (emphasis added).

[5]  *Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (2019) (emphasis added).

corollary of the FDA's mission to regulate in this area *without directly interfering with the practice of medicine*." (emphasis added)); *United States v. Facteau,* 89 F.4th 1, 13 (1st Cir. 2023) ("[T]he FDCA expressly protects the 'authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease … .' 21 U.S.C. § 396. Accordingly, medical professionals may lawfully *prescribe and administer* a device for an off-label use as long as that device has received § 510(k) clearance for any intended use." (emphasis added)), *cert. denied*, 145 S. Ct. 137 (2024); *Washington Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("[N]either Congress nor the FDA has attempted to regulate the off-label use of drugs by doctors and consumers. A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the FDA."); *U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 317 (D. Mass. 2011) ("[T]he FDA … cannot prevent a doctor from prescribing a device for an off-label use for any purpose she deems medically necessary.").

Unsurprisingly, given the weight of this authority, DOJ has regularly represented to federal courts—including in multiple instances *after* the oral argument in this proceeding—that off-label prescribing and administration are appropriate and commonplace. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy,* No. 1:25-cv-11916, (D. Mass Sept. 4, 2025), Dkt. 104 at 4 (stating that "[f]rom FDA's perspective, with few exceptions, healthcare professionals generally may choose to *prescribe* or *use* a legally marketed vaccine for an unapproved (or uncleared) use (also called an 'off-label' use) when they judge that the unapproved use is medically appropriate for an individual patient") (emphasis added); *Penelow v. Janssen Prods., LP*, No. 25-1818, (3d Cir. Aug. 27, 2025), Dkt. 56 at 8 (stating that the FDA does not regulate the practice of medicine and that once a drug "is approved for one use at one dosage, doctors are free to prescribe it for unapproved uses or at

other dosages—a practice sometimes called 'off-label' prescribing"). In these very recent filings, DOJ made no suggestion that doctors are forbidden from communicating with their patients, such as about risks or directions for use, in connection with such lawful off-label uses.

The government's novel theories of liability in this case, which appear to turn in part on the guidance doctors give patients using medications off-label, would also violate the First Amendment rights of doctors to communicate with their patients. It has long been recognized that "punish[ing] physicians on the basis of the content of doctor-patient communications" is impermissible under the First Amendment. *See, e.g.*, *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). If DOJ is permitted to prosecute doctors for off-label prescribing and administration, it will undermine the ability of doctors "to speak frankly and openly to patients," which is "[a]n integral component of the practice of medicine." *Id.* at 636. This legal infirmity, standing alone, would be sufficient to doom DOJ's novel, expansive theories of FDCA liability.

The many legal deficiencies in DOJ's belated and novel theories of FDCA liability, and their inconsistency with DOJ's long-held positions, suggest that its new theories are pretexts, asserted only in a last-ditch attempt to justify investigating the practice of medicine at BCH.

### B.    DOJ's Novel Theories Of FDCA Liability Would Devastate Patient Care

If DOJ were to hold doctors criminally liable for off-label prescribing and administration, there would be severe adverse consequences for patients and families being treated at BCH and across the country. If off-label use were in fact illegal, it would be nearly impossible for doctors to treat children for many conditions. Because of a lack of pediatric-specific data, off-label use—guided by a range of other authoritative evidence and resources, like journal articles and guidelines from professional associations—is a routine and essential part of treating children. The American Academy of Pediatrics has endorsed this practice, recognizing the relative dearth of medications

that are approved for pediatric use.[6] Criminalizing this category of care would have a devastating impact on children who are suffering from many medical conditions.

More generally, off-label prescribing is common and often medically necessary in a wide range of health care settings. For instance, off-label use is prevalent in treating cancer, with physicians prescribing drugs approved for one type of cancer to treat other cancers.[7] Although the FDA approved beta-blockers only to treat cardiovascular disease and high blood pressure, physicians now commonly prescribe them to combat anxiety.[8] And "off-label, off-compendia use is common in solid organ transplantation," where physicians use the medications to facilitate the acceptance of transplanted organs by patients' immune systems.[9]

Prohibiting off-label use—indeed threatening to hold health care providers criminally liable—would jeopardize patient care for pediatric patients and others. This potentially devastating consequence is yet another reason to conclude that DOJ's novel and expansive theories of liability are nothing more than pretexts to justify the subpoena.

### C. DOJ's Alleged Billing Violations Are Beyond The Scope Of DOJ's Authority Under The Subpoena

DOJ's recent filings confirm that there is a fundamental mismatch between the DOJ Civil

---

[6] Kathleen Neville et al., *Off Label Use of Drugs in Children*, 133 Am. Acad. of Pediatrics 563 (2014), https://publications.aap.org/pediatrics/article/133/3/563/32274/Off-Label-Use-of-Drugs-in-Children ("Off-label drug use remains an important public health issue, especially for infants, young children, and children with rare diseases.").

[7] *See generally* Ruishan Liu et al., *Systematic Analysis of Off-Label and Off-Guideline Cancer Therapy Usage in a Real-World Cohort of 165,912 US Patients*, Cell Reports Medicine (Mar. 2024), https://www.sciencedirect.com/science/article/pii/S2666379124000673.

[8] *See* Angelica Stabile, *Common Heart Drug Double as Off-Label Anxiety Aid, Driving Surge in Prescriptions*, Fox News (Sept. 12, 2025), https://www.foxnews.com/health/common-heart-drug-doubles-off-label-anxiety-aid-driving-surge-prescriptions.

[9] Joelle Nelson et al., *Consensus Recommendations for Use of Maintenance Immunosuppression in Solid Organ Transplantation*, Pharmacotherapy (Apr. 2022), https://accpjournals.onlinelibrary.wiley.com/doi/epdf/10.1002/phar.2716.

Division's narrow authority to investigate alleged *FDCA violation*s and the purported new information relating to supposed billing and insurance issues included in the Hsiao Declaration. DOJ has now admitted that its authority to serve the subpoena is limited to the investigation of alleged FDCA violations. *See* Hsiao Decl. ¶ 5 ("Pursuant to Attorney General Order Number 3591-2015,[10] dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(l)(A) and (a)(l)(B) *to investigate violations of the FDCA* that relate to a health care benefit program." (emphasis added)); *see also* Mem. 4 ("Causing the distribution of unapproved drugs can be an *FDCA violation*, which can be a federal health care offense. 21 U.S.C. § 331(d); 18 U.S.C. § 24." (emphasis added)). The alleged FDCA violations have nothing to do with billing issues; they relate to alleged off-label use of medications or distribution of misbranded or unapproved drugs. Hsiao Decl. ¶¶ 11-18. But the newly provided evidence described in the Hsiao Declaration primarily relates to billing for GAC and related records. *See* Hsiao Decl. ¶¶ 31, 35. Evidence like this is not relevant to alleged FDCA violations.[11]

DOJ's attempts to justify why billing information is relevant to an alleged FDCA violation are meritless. DOJ claims information related to intent to defraud is relevant under the FDCA's penalties provision, 21 U.S.C. § 333. *See* Hsiao Decl. ¶ 43. DOJ asserts, "Linking each patient's

---

[10] Counsel for BCH requested a copy of the Attorney General Order, but DOJ has thus far declined to provide it.

[11] Even on its own terms, the information about billing set forth in the Hsiao Declaration is too sparse to support any conclusions regarding possible improper billing. DOJ appears to contend that someone (unspecified) did some kind of analysis of data relating to insurance claims submitted by clinicians at BCH. Hsiao Decl. ¶ 35. The source of that data is unspecified, and the underlying data has not been provided, making validation impossible. Moreover, the method of analysis is not described, leaving numerous open questions. For example, the data in the Declaration are consistent with the possibility that patients were diagnosed with precocious puberty at an earlier age before they started treatment at BCH or that earlier diagnoses at BCH were simply carried forward.

clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent." *Id.* But evidence of intent to defraud would be relevant only if there were an underlying FDCA violation, which (as discussed above) there is not, and even then, only if the intent to defraud were connected to the FDCA violation. *See United States v. Mitchelltree*, 940 F.2d 1329, 1349 (10th Cir. 1991) ("[T]he specific intent requirement in § 333(a)(2) requires not only proof of misbranding under § 331, but also proof of an intent to mislead or defraud *which is connected to the misbranding violation under § 331*."). There is no such connection between the new billing allegations here and the asserted FDCA violations. The mismatch between DOJ's FDCA theories and the purported new evidence in the Hsiao Declaration undermines DOJ's request for reconsideration and confirms that this asserted basis for the investigation is pretextual.

## V. EVEN IF DOJ MET ITS INITIAL BURDEN, THERE IS EXTENSIVE EVIDENCE OF BAD FAITH

In arguing that there "is not a single piece of record evidence" indicating that the Attorney General ordered an unlawful investigation, Mem. 10-11, DOJ ignores the substantial evidence considered and credited by this Court establishing the government's bad faith. Op. 11, 13-14. Indeed, DOJ's Memorandum itself confirms an essential piece of that evidence—the Executive Branch's "policy goal of ending gender-related pharmaceutical and surgical treatment of minors." Mem. 11. An attempt to intimidate physicians into stopping medical care lawful under state law is an impermissible goal for the federal government. *See Gonzales*, 546 U.S. at 273-75 (Attorney General could not revoke physicians' licenses under federal Controlled Substances Act for prescribing drugs in compliance with Oregon's Death With Dignity Act); *Hillsborough Cnty.*, 471 U.S. at 719 ("[R]egulation of health and safety matters is primarily, and historically, a matter of local concern."). DOJ's attempt to argue that the government can simultaneously have a policy

goal of ending GAC and a separate desire to investigate federal healthcare offenses falls short. As the Court found, Op. 11-14, there is a straight path between the government's explicit directives to end that care and the DOJ's bad faith subpoena.

The Court should also reject DOJ's argument that this Court's finding of harassment is unsupported by the record. DOJ claims that the Court's conclusion is based on assumptions about the motives of the Attorney General and Assistant Attorney General. Mem. 12. But the Court did not have to "assume" anything to conclude that the subpoena was issued in bad faith. The Court reviewed "[n]umerous statements by the Administration, executive orders, and memorandums [that] detail the Administration's goal of ending GAC." Op. 11. And DOJ acknowledged at argument and in its motion that ending GAC is the goal of this investigation. Pursuing an unlawful end—and trying to dress that aim up with pretextual justifications—is the very definition of bad faith.

This Court further found that the subpoena requested "an astonishingly broad array of documents and information that are virtually unlimited in scope," all "while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance." Op. 12. These findings were more than sufficient to support the Court's conclusion that the subpoena was issued to "harass and intimidate BCH." Op. 14.

The introduction of the Hsiao Declaration at this late stage, and in direct contradiction to the DOJ's statements at oral argument, underscores that the subpoena was issued in bad faith. Courts have made clear that discovery may be permitted to determine whether the government was acting in bad faith in issuing an administrative subpoena or civil investigative demand. *See SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981) (en banc), *United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977); *FTC v. Bisaro*, 2010 WL 3260042, at *4-6

19

(D.D.C. July 13, 2010). Thus, if the Court were to conclude that more evidence of bad faith is necessary, BCH respectfully requests discovery on the timing of when DOJ discovered the allegations and theories of liability advanced in the Hsiao Declaration, as well as information about the investigation that is not set forth in the Hsiao Declaration. Hsiao Decl. ¶ 7 ("[T]his declaration does not set forth all my knowledge about this matter.").

## CONCLUSION

BCH respectfully requests that the Court deny the government's motion to alter or amend this Court's judgment.

Dated:  October 21, 2025

/s/ Joshua S. Levy
Joshua S. Levy
BBO# 563017
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02119
Telephone:  (617) 951-7000
joshua.levy@ropesgray.com

Douglas Hallward-Driemeier
BBO# 627643
ROPES & GRAY LLP
2099 Pennsylvania Avenue
Washington, DC 10036
Telephone: (202) 508-4600
douglas.hallward-
driemeier@ropesgray.com

Brian R. Blais
BBO# 660601
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9090
brian.blais@ropesgray.com

Respectfully submitted,

/s/ Amanda Masselam Strachan
Amanda Masselam Strachan
BBO# 641108
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
amanda.masselamstrachan@wilmerhale.com

Boyd Johnson (pro hac vice)
Alan Schoenfeld (pro hac vice)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
boyd.johnson@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Brian M. Boynton (pro hac vice)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
brian.boynton@wilmerhale.com

Counsel for Plaintiff The Children's Hospital
Corporation d/b/a Boston Children's Hospital

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 21, 2025, the foregoing was filed via the ECF system, which will serve counsel of record via email.

Dated: October 21, 2025

*<u>/s/ Amanda Masselam Strachan</u>*
Amanda Masselam Strachan
BBO# 641108
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
amanda.masselamstrachan@wilmerhale.com
