# LAW360

Portfolio Media. Inc. | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

## Mass. Ruling May Pave New Avenue To Target Subpoenas

By **Winston Chan, Christine Bonomo and Nicole Butze** (October 14, 2025, 3:54 PM EDT)

The federal government has historically enjoyed broad authority to use administrative subpoenas, civil investigative demands, and related tools in its civil and administrative investigations and enforcement actions.

As a result, motions to quash or otherwise halt the enforcement of such subpoenas have rarely succeeded, with successful challenges generally limited to circumstances in which it was plain from the breadth of the requests that the government was engaged in an impermissible fishing expedition.

Further, in assessing whether to enforce administrative subpoenas or similar investigative tools, courts have generally declined to consider extrinsic evidence as to the propriety of the government's motives.

On Sept. 9, however, in In re: Administrative Subpoena No. 25-1431-019, the U.S. District Court for the District of Massachusetts **quashed** a U.S. Department of Justice administrative subpoena directed at a hospital.[1] In reaching its decision, the court relied, in part, on the fact that the subpoena contained overbroad requests for information inconsistent with a proper government purpose.

The court also, however, relied on public statements made by the executive branch suggesting bad faith or improper motive. The outcome in this case thus points to a potential new avenue of targeting subpoena enforcement for practitioners going forward.

**Historical Background on Investigative Subpoenas**

Historically, federal agencies have enjoyed broad authority to issue administrative subpoenas. And while such subpoenas have been subject to judicial review when challenged, the burden on the government to defend such subpoenas has been minimal. As the U.S. Supreme Court articulated in its 1950 decision in U.S. v. Morton Salt, federal agencies "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."[2]

In general, courts have enforced administrative subpoenas if the government agency proves that (1) the subpoena is issued for a congressionally authorized purpose, (2) the information sought is relevant to the authorized purpose, (3) the information sought is


Winston Chan


Christine Bonomo


Nicole Butze

adequately described, and (4) proper procedures have been employed in issuing the subpoena.[3]

As the U.S. Court of Appeals for the First Circuit observed in its 1989 decision in U.S. v. Comley, affidavits of government officials have generally been accepted as sufficient to make out a prima facie showing that these requirements are satisfied.[4]

With respect to the congressionally authorized or proper purpose requirement in particular, courts have traditionally applied a highly deferential standard.[5] Historically, courts generally held that the validity of a subpoena is judged against the purposes stated in the authorizing statute or resolution, without probing into extraneous evidence.[6] Even where an improper purpose existed, courts have allowed enforcement so long as at least one legitimate purpose supported the subpoena.[7]

As the Supreme Court observed in Morton Salt, it is certainly possible that a "governmental investigation into corporate matters may be such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."[8] But subpoenas are generally enforceable, the Supreme Court continued, so long as they are within the authority of the agency and any requests for information are reasonably relevant to the purpose of the investigation.[9]

In light of the relatively minimal showing required by the government, cases in which courts have quashed subpoenas or declined to enforce portions thereof have been extremely rare. These cases have tended to involve circumstances in which the requests for information have been so broad on their face as to reflect an impermissible fishing expedition for any evidence of wrongdoing.[10] Challengers thus faced a high bar to invalidate government investigative tools.

**Changing Legal Landscape to Investigative Subpoena Enforcement**

The decision in In re: Administrative Subpoena No. 25-1431-019, however, represents a significant departure from courts' traditionally deferential approach to subpoena enforcement.[11]

There, the DOJ had served The Children's Hospital Corp., doing business as Boston Children's Hospital, on June 11 as part of a nationwide set of subpoenas seeking information about gender-affirming care, or GAC. The DOJ alleged that it was investigating unlawful off-label promotion under the Food, Drug and Cosmetic Act and potential "false claims that may have been submitted to federal healthcare programs."

The subpoena contained 15 requests, including "any and all information regarding BCH's personnel, documents, and communications regarding the use of billing codes in connection with GAC for minor patients" and "patients' social security numbers and home addresses."[12]

The district court noted that Massachusetts law recognizes access to GAC as a protected right, and recounted administration directives and statements aiming to end GAC nationwide, such as executive orders and attorney general and DOJ Civil Division memoranda.

The court granted BCH's motion to quash the administrative subpoena, concluding that the government failed to carry its burden to show a proper purpose beyond conclusory references to a healthcare fraud investigation. The court's analysis cited several factors to support its ruling.

First, the court observed that the DOJ offered no "affidavits or other evidence to show [a] proper purpose." The government's only support for its contention that it was engaging in a legitimate investigation — pointing to an attorney general memo directing the DOJ's Civil Division to undertake appropriate investigations[13] — was insufficient.

Second, the court recounted numerous public statements made by the Trump administration, including in executive orders and DOJ memoranda, demonstrating that the administrative subpoena was likely issued to carry out the administration's expressed goal of ending GAC, rather than as a part of a limited healthcare fraud inquiry.

Third, the court observed that the subpoena's requests were overly broad for the government's stated purpose of a healthcare fraud investigation, seeking an array of documents and information that had no connection to fraudulent billing practices or off-label promotion. For example, the subpoena requested "the personnel files of nearly all 2,000 individuals who work for BCH in any capacity."

The court further pointed to the fact that GAC is protected under the Massachusetts Constitution, so it was highly unlikely that BCH was attempting to "evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes" because there is a diagnosis billing code for GAC in Massachusetts.

This reasoning represents a significant departure from the deferential standard courts have historically applied in several ways. Perhaps most significantly, the court considered public statements made by administration and agency officials to conclude that the stated purpose of the subpoena was pretextual. The court's reliance on such evidence contrasts with prior precedent in this area, in which courts evaluated subpoenas solely against the statutory purpose.

Secondly, the court rejected the idea that a mixed-motive subpoena could be enforced. Instead, it required the government to show that "the information sought by the subpoena is limited to these potential healthcare offenses, as opposed to the Government's stated goal of ending GAC."[14]

Thirdly, unlike in Morton Salt — where the court stated that sweeping investigations were upheld as long as they were tethered to a legal inquiry — the Massachusetts court invalidated the subpoena as overbroad because the court believed the requests were insufficiently connected to the articulated purpose.

Notably, on Oct. 7, the DOJ **filed a motion** to alter or amend with the district court, asking it to reconsider its decision and asserting that the court made several errors in its ruling. Among other arguments, the government pointed to historical precedent, arguing that so long as it had statutory authority to investigate the offenses or violations under investigation, the subpoena's purpose was proper — suggesting, though not expressly arguing, that the court's reliance on extrinsic evidence was improper.

The court has not yet issued a ruling on the motion.

**The Evolving Legal Framework for Investigative Subpoena Enforcement in the Digital Age**

For much of the 20th century, courts generally refused to look beyond the four corners of the subpoena when assessing its validity. Even if challengers alleged improper political or retaliatory motives, enforcement was generally permitted so long as at least one proper purpose existed and the subpoena's requests did not suggest the government was engaged in an impermissible fishing expedition.

This deferential approach may have been due, in part, to the fact that extrinsic evidence — such as agency memoranda or administration commentary — was rarely available to litigants or courts.

The modern digital era, however, may be fundamentally reshaping this landscape. Public statements by administrations are now continuously recorded, archived and disseminated through online platforms, press releases and social media. Unlike earlier decades, where official speeches and policy documents were more limited and often inaccessible, courts and litigants now have a vast trove of extraneous evidence to draw upon in challenging the stated rationale of an investigative subpoena.

Internal memoranda are also more readily obtained through Freedom of Information Act requests, leaks and watchdog litigation, further expanding the evidentiary record available to litigants and courts.

Increased access to government officials' or agency heads' commentary on investigative priorities and other issues — through online forums in particular — may begin to influence case law, as the court's decision In re: Administrative Subpoena No. 25-1431-019 suggests.

Looking ahead, the implications for practitioners could be significant — especially if the Massachusetts district court's order stands. Agencies must now recognize that public pronouncements by their top agency officials can directly affect the enforceability of investigative subpoenas.

There is also likely to be an uptick in challenges to administrative subpoenas or civil investigative demands. These challenges may increasingly rely on public statements by agency officials to support an argument that the government's demands are not just overbroad fishing expeditions, but also motivated by an improper purpose or bad faith.

Indeed, with near constant access to administration rhetoric, litigants may be able to more easily to frame investigative tools as politically motivated.

---

*Winston Chan is a partner, and co-chair of the global white collar defense and investigations practice group and the False Claims Act/qui tam defense practice group, at Gibson Dunn & Crutcher LLP. He previously served as an assistant U.S. attorney in the Eastern District of New York.*

*Christine Bonomo is an associate at Gibson Dunn. She previously served at the DOJ, most recently as the acting deputy chief for counterintelligence of the Counterintelligence and Export Control Section.*

*Nicole Butze is an associate at Gibson Dunn.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of their employer, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] In Re: Administrative Subpoena No. 25-1431-019 🔴 , Case No. 1:25-mc-91324-MJJ (D. Mass 2025).

[2] United States v. Morton Salt Co., 338 U.S. 632, 642-43 (1950).

[3] U.S. v. Sturn, Ruger & Co., 84 F.3d 1, 4 (1st Cir. 1996) (citing United States v. Morton Salt Co., 338 U.S. 632, 652-53 (1950), Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 208 (1946); United States v. Comley, 890 F.2d 539 (1st Cir. 1989)); see also EEOC v. Tempel Steel Co., 814 F.2d 482, 485 (7th Cir. 1987).

[4] United States v. Comley, 890 F.2d 539, 541 (1st Cir. 1989).

[5] See F.T.C. v. Carter, 636 F.2d 781, 789 (D.C. Cir. 1980); Donaldson v. United States, 400 U.S. 517, 534-35 (1971), rev'd on other grounds, Polselli v. Internal Revenue Service, 598 U.S. 432 (2023); Morton Salt, 338 U.S. 632 (1950); Trade Commission v. American Tobacco Co., 264 U.S. 298 (1924).

[6] F.T.C. v. Carter, 636 F.2d 781, 789 (D.C. Cir. 1980).

[7] Id. (citing Donaldson v. United States, 400 U.S. 517, 534-35 (1971), rev'd on other grounds, Polselli v. Internal Revenue Service, 598 U.S. 432 (2023).

[8] Morton Salt, 338 U.S. at 652 (citing Federal Trade Commission v. American Tobacco Co., 264 U.S. 298 (1924).

[9] Id. at 652.

[10] See e.g. In re: Sealed Case (Administrative Subpoena), 42 F.3d 1412 (D.C. Cir. 1994) (declining to enforce agency subpoenas for the general purpose of uncovering "unknown" "wrongdoing" as an impermissible "fishing expedition"); see also United States v. Theodore, 479 F.2d 749 (4th Cir. 1973) (reversing district court order enforcing an IRS summons because it was "unprecedented in its breadth," seeking all returns of the recipient's clients for several years and all records, memos, and workpapers related to those returns"; and observing that that the "Government cannot go on a 'fishing expedition' through records").

[11] In Re: Administrative Subpoena No. 25-1431-019, Case No. 1:25-mc-91324-MJJ (D. Mass 2025).

[12] Id. at 4.

[13] On April 22, 2025, Attorney General Pamela Bondi issued a memorandum, titled "Preventing the Mutilation of American Children," directing the Civil Division of the DOJ "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drugs used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, Preventing the Mutilation of American Children, Office of the Attorney General, at 3-4 (April 22, 2025), https://tinyurl.com/2b9kaja7.

[14] Id. at 11.

All Content © 2003-2025, Portfolio Media, Inc.